LENDERS FINANCIAL CORPORATION

v.

DAVID N. TALTON

Record No. 940563

March 3, 1995

Present: All the Justices

*David C. Schroeder (Murphy, McGettigan, Richards & West,* on briefs), for appellant.
*Jon F. Mains (Mains & Mains,* on brief), for appellee.

JUSTICE COMPTON delivered the opinion of the Court.

This is an action brought by a mortgage banking company against a residential real estate developer on a written "broker fee agreement" to recover a sum allegedly due under the agreement for assistance in obtaining financing for one of the developer's projects.

In 1989, appellee David N. Talton, the defendant below, was involved in developing a 9.5-acre tract of land that he had purchased in 1981 in Fairfax County. The project is known as Williamsburg Commons and involves construction in two phases of houses on 38 lots. Each lot was valued at $175,000, and the anticipated sales prices of the homes ranged from $470,000 to $700,000.

In early 1992, the project was behind schedule and construction was stopped because defendant's lender, Dominion Bank, had ceased financing and begun foreclosure proceedings. At that time, defendant owed approximately $4 million to Dominion, which had committed funds for "acquisition," "development," and "construction." Defendant procured Dominion's tentative agreement to discount the $4 million debt to $2.5 million if defendant could find another lender to refinance the obligation to Dominion.

During the "first quarter of 1992," defendant contacted consultants and numerous banks seeking financing. These efforts produced several "financing packages," but they were unsatisfactory because, according to defendant, they "weren't going to occur timely enough." Defendant then contacted several brokers, including appellant Lenders Financial Corporation, the plaintiff below, to find him the necessary financing. Plaintiff was a mortgage banking company that, in 1992, "did some brokering of commercial type loans."

In early 1992, several of plaintiff's officers met with defendant on the project site. At the time, only one home, which was occupied by defendant, had been completed. Defendant "explained his predicament" and stated that "he really needed a new loan to keep the project going" and "to get out from under the present loan with Dominion Bank." The plaintiff's president, James R. Niblock, told defendant he "was very skeptical that anything at all could be done" and urged defendant "to work out something" with Dominion Bank.

About a week later, plaintiff's representatives, including William C. Harrison, its executive vice president, met defendant on the site. Defendant stated that he "just needed a loan to take out Dominion" and represented that he had procured sales contracts from six prospective purchasers who "were willing and able to sign for their own construction loans."

After further discussions, defendant and his wife signed a letter addressed to Harrison dated March 26, 1992 to "outline" the re-

quest for financial assistance. In a section of the letter labelled "What we need," defendant wrote, "A commitment for a two and one half million dollar loan ($2,500,000)" and "A letter of credit to Fairfax County for approximately $200,000." In the letter, defendant stated that "Six houses have been sold" and that he expected to sell "an additional two to three in April." Commenting on the progress of the project, he wrote, "All of the utilities are in for the eleven lots in Phase I with more than 40% of the work performed for Phase II. Three lots in Phase II are ready for construction." Defendant also wrote that the potential lender "would not have to provide the house construction loans, unless of course it would like to do so."

Against this background, Harrison, for the plaintiff, and defendant entered into the contract in dispute, which the plaintiff calls on brief a "finders fee agreement." The agreement is comprised of two writings, both executed by the respective parties: first, a letter drafted and signed by Harrison addressed to defendant dated March 30, 1992 from which defendant deleted one sentence that is not relevant to this controversy; and second, a paper labelled "First Amendment to Agreement," drafted by defendant.

The first writing follows, showing the deletion and complete with spelling and punctuation errors:

"This letter sets forth the terms pursuant to which Lenders Financial Corporation (placement agent) is being retained by David Talton and The Talton Company (borrower) to assist in the placement of an acquisition; development and construction loan (ADC) in the approximate amount of two million five hundred thousand dollars ($2,500,000).

"LFC will introduce David Talton to specific lenders that have an interest in lending such monies as needed to finance such project known as Williamsburg Commons, Vienna, Virginia. If the transaction is closed with the borrower and lender then a fee of (3%) of gross sales is due Lenders Financial Corporation. Such fee will be no less than two hundred and fifty thousand dollars ($250,000), paid as follows; one hundred thousand ($100,000) from the proceeds of the first 4 settlements and ten thousand dollars ($10,000) on each settlements thereafter until the project is sold out. Any balance owed to LFC will be paid from the last sale.

"~~In the event of any dispute relating to this agreement, the prevailing party shall be entitled to attorney fees~~. Agent will be protected for a period of twenty-four (24) months with such lenders as maybe introduced.

"We are looking forward to working with you on this transaction."

The second writing provided:

"An agreement between David Talton and Lenders Financial was set forth on March 30, 1992. This first amendment to that agreement shall be incorporated into that agreement.

1. In no event shall the total fees due Lenders Financial Corporation exceed five hundred thousand dollars ($500,000).

2. It is expressly agreed that no fee shall be earned by Lenders Financial Corporation unless and until closing has been held and proceeds have been funded and received by Talton.

3. Lenders Financial Corporation shall register each lender with David Talton."

Following execution of the agreement, plaintiff introduced defendant to Virginia First Savings Bank, actively assisted defendant during his negotiations with Virginia First, and contacted Dominion Bank regarding its discount. In June, Virginia First agreed to advance defendant $2.8 million, and the loan was closed. As a result of the Virginia First loan and additional construction financing by that bank, work on the project resumed. Subsequently, a number of houses were sold, and defendant refused to pay plaintiff's fee for services. This action followed.

In a motion for judgment filed in December 1992, plaintiff sued on the agreement, asserting that it "successfully provided the services that Talton requested in the contract." Plaintiff alleged that the refusal to pay the agreed fee constituted a breach of the contract because "at least four houses at the Williamsburg Commons project referred to in the contract have gone or will go to settlement prior to the end of 1992" and that "more houses are ex-

pected to go to settlement within the next several months." Plaintiff asked for "at least $100,000 under the terms of the contract" and asserted that it had "suffered damages of up to $500,000 due to Talton's breach of contract."

Responding, defendant generally denied that plaintiff was entitled to recover under the agreement, that he had breached the agreement, and that plaintiff had suffered any damages. Additionally, without elaboration defendant asserted defenses of fraud, duress, undue influence, "No meeting of the minds," breach of contract, and lack of consideration.

In a January 1994 bench trial, the defendant moved to strike the plaintiff's evidence at the conclusion of the plaintiff's case-in-chief. The defendant's motion had three bases: first, plaintiff had failed to perform the contract in that the Virginia First loan only provided "acquisition" funds, not "development" and "construction" funds, contrary to the agreement which specified "placement of an acquisition; development and construction loan;" second, plaintiff had failed to perform because the contract provided that plaintiff would introduce defendant to lenders having an interest in lending monies "as needed to finance such project," and the project was the development and construction of Williamsburg Commons, not the refinancing of the Dominion loan; and, third, plaintiff had failed to prove damages.

The trial court denied defendant's motion on the first two grounds, ruling the plaintiff had established, prima facie, that it had performed the contract and that the defendant had breached the contract by nonpayment. The court sustained defendant's motion on the third ground, however, ruling that the plaintiff had failed to prove damages with reasonable certainty. The court, based upon its interpretation of the contract, opined that plaintiff failed to show the sale prices of the approximate six houses and two lots that, according to the evidence, had sold by the time of trial. The court stated: "Even if all eight of those properties sold at $700,000, the three percent gross sales still wouldn't come to the minimum $250,000 that is being sought to be imposed here." Accordingly, the court entered summary judgment in favor of defendant.

We awarded the plaintiff an appeal based upon its assignments of error asserting the trial court incorrectly ruled it had failed to prove damages. We also awarded the appeal upon defendant's

assignments of cross-error asserting the trial court incorrectly ruled plaintiff had performed the contract.

Initially, we shall address the performance issue raised by defendant's assignments of cross-error. On appeal, defendant first argues that, considering the terms of the contract, plaintiff was required to prove "that it had assisted in the placement of an Acquisition, Development & Construction loan," but that the "testimony and exhibits showed that the loan which closed was an acquisition loan only." Second, defendant contends that even if such loan had been placed, plaintiff "would not have earned its fee until closing had been held and proceeds for acquisition, development, and construction had in fact been received by Talton. Again, the only funds received by Talton were funds for acquisition, not funds for construction or development." On appeal, defendant has split into two contentions the first ground of his motion to strike made at the trial level. He has wisely abandoned the second ground of that motion to the effect that the contract did not contemplate mere refinancing but provided for financing the balance of the development and construction of the project.

We do not agree with defendant's contentions. In accord with settled principles of appellate review in a case like this when a trial court has sustained a defendant's motion to strike at the conclusion of the plaintiff's case-in-chief, we are viewing the evidence and all reasonable inferences in the light most favorable to the plaintiff.

There is no dispute in plaintiff's evidence that it introduced defendant to Virginia First Bank, plaintiff participated and assisted defendant in his negotiations with the bank, and the bank advanced defendant in excess of $2.5 million. Proof of these facts ordinarily would establish, prima facie, that plaintiff fully performed its obligations under the contract.

Defendant contends, however, that the *type* of loan he received was not the type of loan he asked plaintiff to procure for him. There is no merit to this contention. Even though the first paragraph of the agreement refers to assistance in the placement "of an acquisition; development and construction loan (ADC)," nowhere in the agreement are those terms defined. Moreover, definitions of those terms were never the subject of any discussion between the parties prior to execution of the contract, although Harrison testified to his perception of the words, and the evidence

fails to reveal that there is any standard industry definition of the terms.

The evidence to this point in the case is clear, however, that when defendant approached plaintiff in March 1992 for assistance, defendant's project was about to collapse. He was in default on his $4 million loan from Dominion Bank, work had stopped, and foreclosure was imminent. The sums advanced by Dominion had been used for acquisition and development of the land as well as construction of the houses. Defendant had been unsuccessful in obtaining, through his individual efforts, satisfactory financing to "take out" Dominion Bank. Almost contemporaneous with the drafting of the agreement, defendant wrote plaintiff on March 26th stating a need for only a $2.5 million advance plus a $200,000 letter of credit to Fairfax County. In a separate memo sent by defendant to plaintiff on March 26th, defendant made plain that he did not expect any prospective lender to advance more than the sum necessary to purchase the "old loan."

In sum, the interpretation most consistent with the circumstances of the parties at the time of contracting indicates that the mention of an "ADC loan" in the first paragraph of the contract merely referred to obtaining refinancing of Dominion's loan, without any binding condition about the manner in which the loan proceeds actually would be used. This is precisely the benefit defendant received from plaintiff's efforts when the proceeds were paid by Virginia First Bank. Consequently, we hold that the trial court did not err in overruling the motion to strike and in deciding that the plaintiff had established a prima facie case of contract performance.

And, because defendant's repudiation of this executory contract constitutes an anticipatory breach, plaintiff may sue on the contract without waiting for the time of defendant's performance to arrive. *Board of Supervisors of Fairfax County* v. *Ecology One, Inc.*, 219 Va. 29, 33, 245 S.E.2d 425, 427-28 (1978); *Simpson* v. *Scott*, 189 Va. 392, 397-98, 53 S.E.2d 21, 23-24 (1949).

We turn to the issue in the main appeal raised by the plaintiff's contention that the trial court erred in ruling that it failed to prove its damages with reasonable certainty. Plaintiff contends that the contract mandates a minimum fee of $250,000 regardless of the total amount of gross sales at Williamsburg Commons.

Parenthetically, we reject defendant's argument that plaintiff is "barred from raising this argument due to its failure to allege in its pleadings that there was a minimum fee provision." The motion for judgment alleged plaintiff "is due at least $100,000 under the terms of the contract" and has "suffered damages of up to $500,000." Moreover, during argument of the motion to strike, plaintiff's counsel said, "But our damages are based on what the agreement says, and for one thing, the agreement puts a floor of 250,000, and a ceiling of 500,000, regardless of what happens." While the language of the motion for judgment is imprecise on the issue, it clearly is sufficient to support plaintiff's minimum-fee contention.

Plaintiff argues that if the fee provisions of the agreement are read harmoniously and given their plain meaning, "the '3% of gross sales' provision only applies to the amount of the fee earned or payable after payment of the minimum fee of $250,000." According to plaintiff, it "thus proved damages of at least $250,000 with reasonable certainty because: (1) it successfully performed the contract; (2) the contract was in evidence; (3) Talton admitted he had sold eight houses subsequent to the closing of the Virginia First loan; and (4) it was undisputed and a matter of record that Talton had breached the contract by renouncing and repudiating it." We agree with the plaintiff and its analysis of the contract documents.

There is no ambiguity in the fee provisions of this contract. Thus, we are not bound on review by the trial court's construction of such provisions. *Wilson* v. *Holyfield*, 227 Va. 184, 187, 313 S.E.2d 396, 398 (1984). The intention of the parties as expressed by them in the words they have used governs contract construction; courts must conclude that the parties intended what the written instrument plainly declares. *Magann Corp.* v. *Virginia-Carolina Elec. Works, Inc.*, 203 Va. 259, 264, 123 S.E.2d 377, 381 (1962).

The fee provisions, as the plaintiff argues, include five categories. First, the total amount of the fee is stated: "If the transaction is closed with the borrower and lender then a fee of (3%) of gross sales is due Lenders Financial Corporation." This general statement is modified by more specific remaining provisions.

Second, an absolute minimum fee is established: "Such fee will be no less than two hundred and fifty thousand dollars ($250,000)." Third, the agreement provides that the minimum fee

is to be "paid as follows" in installments, "one hundred thousand ($100,000) from the proceeds of the first 4 settlements and ten thousand dollars ($10,000) on each settlements thereafter until the project is sold out."

Fourth, the contract has a provision for payment of fees earned but not otherwise paid during the course of the project: "Any balance owed to LFC will be paid from the last sale."

Fifth, the parties in the amendment agreed to fix a maximum fee amount: "In no event shall the total fees due Lenders Financial Corporation exceed five hundred thousand dollars ($500,000)."

■ Therefore, and contrary to the trial court's interpretation, the plaintiff did not have to present evidence of the exact sales price of each of the houses sold by defendant to be entitled to the minimum fee of $250,000 and to survive a motion to strike. Plaintiff was entitled to the minimum fee when evidence was presented that defendant had sold only one house after the Virginia First transaction was closed. The "3% of gross sales" provision, and hence the sales prices of the houses, becomes relevant only when there must be a determination of the maximum fee that can be earned. In other words, the $250,000 minimum fee is absolute; the manner of payment of that sum relates to the sales of the first 19 houses ($100,000 from the proceeds of the first four settlements and $10,000 from each of the next 15 settlements); and the "3% of gross sales" provision governs the fees that are earned above the $250,000 minimum fee until the "cap" of $500,000 is reached.

■ Consequently, we hold that the trial court misconstrued the contract and erred in ruling that the plaintiff had failed to establish any damages; the plaintiff proved damages of at least $250,000. Thus, the judgment appealed from will be reversed, and the case will be remanded for further proceedings.

*Reversed and remanded.*