## Richmond

CHARLES A. BROADDUS v. STANDARD DRUG COMPANY, INCORPORATED, ET AL.

March 8, 1971.

Record No. 7298.

Present, All the Justices.

*S. W. Tucker* (*Hill, Tucker & Marsh*, on brief), for plaintiff in error.

*Harry P. Anderson, Jr.; J. Robert Brame, III* (*George E. Haw, Jr.; Willard I. Walker; Anderson, Haw, Parkerson & Beazley; McGuire, Woods & Battle*, on brief), for defendants in error.

HARRISON, J., delivered the opinion of the court.

In his motion for judgment the plaintiff, Charles A. Broaddus, sought to recover damages for personal injuries from defendants, Standard Drug Company, Incorporated, Clarence E. Williams, The William J. Burns International Detective Agency, Incorporated and Robert Lee Troutner. He alleged that he was assaulted by Williams, agent of Standard and Burns, and was shot by Troutner, agent of Burns and Standard.

Service of process was never obtained on Troutner. The case proceeded to trial against all other parties. The court below struck the evidence as to Standard and entered summary judgment in its favor. The jury returned a verdict for Williams with respect to his alleged assault on the plaintiff, and for Williams and Burns with respect to the alleged shooting. The court entered final judgment for the defendants, and we granted plaintiff a writ of error.

Standard operates a store located at 1st and Broad Streets in Richmond. The store is served by two parking lots. One lot runs from the south side of Marshall Street to the rear of the store. The other lot is directly across Marshall and extends in a northerly direction.

On December 14, 1966 Williams, a member of the Richmond police force, was assigned to the "shoplifting detail" and was patrolling the downtown Broad Street stores. At 6 P. M., dressed in civilian clothes, he entered Standard's store and about five minutes thereafter noted the entrance of Broaddus and four companions. He observed that the men appeared to be splitting up. One in the group went to the check cashing counter, three to the food concession counter, and

Broaddus to a point at the top of steps that lead to the store's basement.

Broaddus noticed that Williams' hat was pulled down over his ears. He called this to the attention of his companions and they all laughed. Williams said that Broaddus appeared to be giving signals to the others. He then approached Broaddus and inquired "what was so funny". He told plaintiff that he was a police officer, and asked him if he had any identification. Broaddus demanded identification of the officer. Williams showed Broaddus his badge. This apparently did not satisfy plaintiff for he again demanded identification of the officer and Williams again exhibited his badge. The officer testified that at this time plaintiff said, "You still haven't showed me any identification", spoke "in a more than normal voice" and "got loud". The officer then said, "I told him, . . . 'Do you mind stepping outside?'" The parties started toward the steps which led to the rear entrance.

Williams testified that before reaching the steps Broaddus was walking a little ahead and that when his left arm got close to the officer's right hand he put his hand up on plaintiff's arm; that when plaintiff got ready to go down the steps, "that's when he whirled and started back toward me". The officer pushed him and a violent scuffle ensued, which resulted in Broaddus being pushed through the rear glass door of the store, landing outside.

The version of Broaddus is that when he refused to show Williams some identification, Williams grabbed him by the arm, slung him around and said come on and go outside. Plaintiff claimed that he was off balance on the steps when he grabbed Williams, and that he was pushed down the steps and shoved or knocked through the glass door.

William T. Holder, Standard's assistant manager, witnessed the altercation. He heard the two demands made by Broaddus of the officer for identification and saw Williams remove his folder twice and show Broaddus something which he assumed was a badge. Holder said that when the officer and plaintiff started down the three steps that led to the rear entrance Williams was very close behind Broaddus, but he did not think they were touching. He said that on the second or third step Broaddus "turned around and either grabbed or pushed or hit, or whatever he did he went back against the officer face to face, and this is when they started the scuffle". He said initially there was more pushing or shoving than hitting because the officer was wearing a heavy coat, but that after they got to the back door Broaddus was pushed through the door.

The officer testified that on the outside of the store, when he tried to get plaintiff up, Broaddus grabbed him by the leg, tried to pull him down and also endeavored to pull his legs apart. At this time the officer hit plaintiff with his fist. The parties continued fighting until the officer pulled his revolver and cocked it, advising plaintiff that if he hit him one more time he would shoot him. At this point Troutner, dressed in a Burns uniform, ran up from the rear of the parking lot to the officer's left. Williams noted that Troutner approached "as if he were going to get the revolver from his holster". Williams said that this made him automatically put his revolver back because he was a plainclothes policeman and Troutner did not know who he was.

At about the same time city police officer Nelson E. Whitt, who had been in the store and heard the commotion in the back, came up on Williams' right and inquired "what was wrong" and if everything was under control. According to Williams, Whitt said to Troutner, "OK, get back. This is a police officer". Whitt testified that he recognized Williams as being a plainsclothes police officer, and that Williams then had Broaddus backed up against the building. Williams also testified that Whitt told the group gathered around the officer and Broaddus, "Everybody get back, this is a police officer making an arrest". One of plaintiff's companions, Richard Adams, apparently insisted that the police had to let "this fellow that he had go, that it was just a big misunderstanding". Whitt said he told Adams three or four times to leave and that when he refused he placed him under arrest. Adams broke from the crowd and ran back into the store with Whitt in pursuit. Prior to this incident Whitt had called the patrol wagon.

Williams noted that the crowd was moving in, and, observing another of plaintiff's friends behind him, he told the man to get back. When he didn't comply Williams "went to reach for him to get him over in the crowd". During the time that his attention was directed to this individual Broaddus ran.

When Williams looked around Broaddus was running north in the parking lot with Troutner in pursuit. They continued to Marshall Street where Broaddus turned east and ran some distance along that street before being shot by Troutner. Williams testified that during the pursuit he heard somebody holler "halt". He could not tell who it was for plaintiff and Troutner had gotten out of his view, and Williams was some distance behind them. Williams also heard some unknown person behind him say "shoot". It is not controverted that

Broaddus was shot by Troutner, and that he sustained serious personal injuries.

Clearly Officer Williams was not an agent or employee of Standard and this allegation in plaintiff's motion was not substantiated.

### As to the liability of Standard.

█ We agree with the action of the trial court in striking the evidence as to Standard and entering summary judgment in its favor. Standard contracted with Burns to provide one of their guards to handle the traffic on the store's parking lots. Troutner was the guard who was provided and on duty the day in question. It was understood that the guard was also to accompany the employee from Standard who made deposits at the bank. The record is conclusive that this was the sole duty of the guard and that he had nothing to do with the store. Standard employed its own security police for that purpose.

The guards were employed, discharged, paid and controlled by Burns. Standard had no voice in their selection or the choice of the guard to be assigned to the parking lots. The guards were instructed as to their duties by a supervisor of Burns. If a guard proved unsatisfactory, Burns was notified by Standard and a different one would be assigned. Standard had little contact with the guards. Under these circumstances no master-servant relationship existed between Standard and Troutner. The question remains whether Standard is liable in its status as the employer of an independent contractor.

█ In *N & W Railway* v. *Johnson*, 207 Va. 980, 983-84, 154 S. E. 2d 134, 137 (1967), Mr. Justice I'Anson reviewed numerous cases decided by this court dealing with exceptions to the general rule relating to the liability of an employer of an independent contractor. There it was stated:

"The general rule in Virginia, as elsewhere, is that the employer of an independent contractor is not liable for physical harm caused to another by an act or omission of the contractor or his servants. [Citing authorities.] There are exceptions to the general rule with respect to work which is unlawful, a nuisance, inherently dangerous, or will in the natural course of events produce injury unless special precautions are taken. [Citing cases.]"

The opinion also makes reference to *Ritter Corporation* v. *Rose*, 200 Va. 736, 107 S. E. 2d 479 (1959) and points out that the excep-

tion in *Ritter* was not limited to activities which are ultra hazardous in the sense that they create danger which cannot be eliminated even with the utmost due care. We further said:

> "*Ritter* does not mean, however, that an employer is liable for every activity which will cause injury unless carefully done. [Citing cases.] Indeed, nearly all activities could result in injury when carelessly done. [Citing authority.] The distinction to be made is between work which is of such character that, if properly done, no injurious consequences can arise, and work which is of such character that injury to others is likely unless precautionary measures are adopted. [Citing authorities.]" 207 Va. at 987, 154 S. E. 2d at 139.

Standard had a right to believe and expect that Troutner, or any other guard furnished by Burns, would control the flow of traffic in and out of its parking lots and would accompany its employee to the bank to make deposits, and that is all. The work to be performed for Standard by Burns was not unlawful, it was not a nuisance and it was not inherently dangerous nor would it in the natural course of events produce injury unless special precautions were taken. In connection with its employment of the Burns agency, Standard could not reasonably anticipate that incident to such employment one of the Burns guards might shoot a person attempting escape from a police officer.

The exception to the general rule imposing liability on an employer of an independent contractor for the physical injuries caused by the negligence of the contractor or his servant is not applicable here.

### As to the liability of Williams.

We now turn to the liability of defendant Williams. The evidence as it relates to the altercation between Williams and Broaddus presents a question of fact. Manifestly Broaddus had not committed a misdemeanor in the presence of Williams, or done any act in his presence which reasonably appeared to constitute a misdemeanor, prior to the time the officer and plaintiff started down the steps "to go outside". The mere failure of Broaddus to provide the officer with identification did not provide probable cause justifying his arrest, and if made then it was an unlawful arrest.

The evidence of what occurred on the steps as the parties started towards the rear door is in sharp conflict. If the jury had accepted

plaintiff's version they would necessarily have concluded that Williams was the aggressor and that he launched an attack on the plaintiff. If the testimony of Williams and Holder is accepted it was the plaintiff who turned on the officer and attacked him, resulting in the fight and his ultimate arrest and detention at the point of the officer's gun.

This case consumed three days in its trial.[1] At the conclusion of the evidence the respective parties tendered to the court 49 instructions. The court granted 24 including 3 which it prepared. Others were refused or withdrawn.

The court granted the following instruction of plaintiff after amending it by inserting the italicized portion. The instruction as granted reads, in part, as follows:

"Although the jury may believe that the defendant Clarence E. Williams had arrested or was attempting to arrest the plaintiff, the jury is instructed that Clarence E. Williams did not have a right to arrest the plaintiff *solely* for a failure or refusal to display his identification and that such arrest *without a reasonable belief upon Williams' part that a misdemeanor or felony was being committed*, would be unlawful."

Plaintiff objected to this instruction as amended on the ground that under the evidence there could have been no reasonable belief on the officer's part that a misdemeanor or felony was being committed.

We find the instruction objectionable as offered by counsel for the plaintiff and as granted by the court. The statement that the arrest of plaintiff could not be made solely for a failure or refusal to display his identification was correct. However, the instruction did not go far enough to encompass the arrest of plaintiff by the officer if made as a result of the alleged assault on Williams by Broaddus. Further-

---

[1] The record is incomplete, inadequate and sketchy. We have before us the testimony of only five witnesses and a short "statement of the facts and incidents of the case". The defendants moved for dismissal of the writ of error, alleging that the plaintiff did not tender a transcript, or give defendants an opportunity to order one from the court reporter. They state that it was impossible for counsel to obtain a complete transcript during a seven-day period, shortened by a three-day holiday weekend, in which the court reporter had to prepare it. We deny the motion to dismiss, but observe that the complaint of defendants is not without some justification. Counsel should at all times endeavor to comply strictly and fairly with Rule 5:1, § 3(f) and other rules regarding tender of transcript and reasonable notice. The absence of the complete record in this case has handicapped this court in its consideration of it.

more, there is no evidence that plaintiff had committed a felony, and none that he had committed a misdemeanor in the officer's presence prior to the time he and Williams started to go outside.

Under this instruction the jury might have concluded that, while Williams did not have a right to arrest plaintiff solely for his failure to display his identification, nevertheless such failure, coupled with other actions of plaintiff which aroused the officer's ire or suspicion, was sufficient.

The sole issue that should have been submitted to the jury was whether the officer assaulted Broaddus at the time and as plaintiff claimed, or whether Broaddus assaulted Williams at the time and as the officer contended.

If the officer attempted to arrest Broaddus for failure to show his identification, or because plaintiff and his companions laughed at him, or because the officer thought that plaintiff was "passing signals", or for a combination of these reasons, it was an unlawful arrest and plaintiff could resist with such reasonable force as was necessary to repel that being exercised by the officer in his unwarranted undertaking.

If the arrest of Broaddus occurred as a result of and following the attack by him on the officer, then the arrest by the officer without a warrant was lawful, for plaintiff had committed a misdemeanor in his presence. The officer could have then used such reasonable force as was necessary under the existing circumstances to effect a lawful arrest of the plaintiff and to prevent his escape.

It is our conclusion that error was committed by the trial court in the instructions[2] which submitted this issue to the jury. Accordingly we reverse the judgment of the lower court for Williams with respect to his alleged assault on the plaintiff.

We find no evidence in the record on which a verdict against Williams for Troutner's shooting of plaintiff could have been predicated. We therefore do not comment on the instructions which submitted this issue to the jury.

### As to the liability of Burns.

The question of the liability of Burns for the act of its employee Troutner in shooting the plaintiff presents more difficulty. The difficulty arises in applying the generally accepted legal test to

---

[2] Instruction No. X granted by the court also contains language from which the jury could have concluded that, prior to the struggle which ensued between plaintiff and Williams, plaintiff had committed provocative acts which justified his arrest.

the factual situation in the instant case. In *Appalachian P. Co.* v. *Robertson*, 142 Va. 454, 456, 129 S. E. 224 (1925) we said:

"While the law upon this question appears to be simple, there has always been very great difficulty in its application, and it has been frequently said that it is impossible to state it briefly and comprehensively so as to be clearly applicable to all cases, because of the ever varying facts and circumstances of particular cases."

In *United Brotherhood* v. *Humphreys*, 203 Va. 781, 786-87, 127 S. E. 2d 98, 101-02 (1962) it was held:

"A principal is responsible for the willful or malicious acts of his agent committed within the scope and course of his employment. The test of the liability of the principal for the tortious acts of his agent is not whether the tortious act itself is a transaction within the ordinary course of the business of the principal, or within the scope of the agent's authority, but whether the service itself in which the tortious act was done was within the ordinary course of such business or within the scope of such authority. [Citing authorities.]

"In *Davis* v. *Merrill*, [133 Va. 69, 77, 112 S. E. 628, 630-31 (1922)], this Court quoted with approval from 2 Mechem on Agency, 2d ed., § 1960, the following definition of 'scope of employment';

" ' "In many cases, no better definition can be given than the words themselves suggest. But, in general terms, it may be said that an act is within the scope of the employment if (1) it be something fairly and naturally incident to the business, and if (2) it be done while the servant was engaged upon the master's business and be done, although mistakenly or ill-advisedly, with a view to further the master's interests, *or from some impulse or emotion which naturally grew out of or was incident to the attempt to perform the master's business*, and did not arise wholly from some external, independent, and personal motive on the part of the servant to do the act upon his own account." ' (Emphasis added.)"

In *Alvey* v. *Butchkavitz*, 196 Va. 447, 453-54, 84 S. E. 2d 535, 539 (1954) the court said:

"We have repeatedly held that where the relationship of master and servant has been established the burden is on the master to prove that the servant was not acting within the scope of his employment when he committed the act complained of, and that if

the evidence leaves the question in doubt it becomes an issue to be determined by the jury. [Citing cases.]

"Thus we subscribe to the holding that if the deviation from the master's business is slight on the one hand, or marked and unusual on the other, the issue is for the court to decide; whereas, if the facts in the particular case place the question between these two extremes, the question becomes a factual issue for the jury. [Citing cases.]"

We must determine whether or not Troutner's deviation from his employer's business was slight or marked and unusual. If so the issue was one the court should have decided. If the facts place the question between the two extremes it was properly submitted to the jury.

We have heretofore considered the contract between Standard and Burns. Troutner was employed on December 14th, 1966 by Major Joseph R. Leonard, district supervisor of the Richmond division of the Burns Agency. Leonard testified that he talked with Troutner for about an hour in his office prior to taking him to the Standard parking lot. There he was instructed by Leonard as to the nature of the work he was to perform.

This witness said that Troutner was instructed in "what the job consisted of" and told that it was only a temporary job. Troutner was given the Agency's standard guard manual and Leonard said that he fully impressed on him the following paragraph:

"Firearms should only be used by the guard when he is forced to defend his life against an armed assailant or protect the personnel or property of the client against an armed intruder."

Leonard said that Troutner "claimed he fully understood the use of the gun and full instructions of the job".

The evidence of the role played by Troutner in the shooting of plaintiff is meager. His involvement occurred after the fight between Williams and Broaddus and after plaintiff had been subdued. There is no evidence that Troutner had any knowledge of what had occurred, and what he heard or observed is unknown.

We might surmise that Troutner acted out of a desire to assist a police officer in subduing a prisoner who was resisting arrest. However, the plaintiff had been subdued when Troutner arrived. Moreover, Officer Williams made no request of Troutner for assistance, and the record is completely bare of objective evidence as to the in-

tent of Troutner in shooting Broaddus. It was therefore error for the court to have given the following instruction:

> "The Court instructs the jury that if you believe from the evidence that Troutner's sole purpose in shooting the plaintiff was to assist the police in the recapture of the plaintiff, then regardless of whether this action of Troutner's was lawful or unlawful, he was not within the scope of his employment with Burns Detective Agency, and you should find your verdict in favor of the Defendant, Burns Detective Agency."

Not only was the instruction unsupported by evidence, but, as framed, it did not include the essential element of a request by Officer Williams for assistance and the requirement that the jury determine Troutner's purpose in shooting Broaddus from objective evidence.

Over the objection of plaintiff, the court also granted the following instruction:

> "If you believe from a preponderance of the evidence that at the time of the shooting Troutner had temporarily parted from the business of Burns and from the scope of his employment, and was engaged in an independent venture of his own, then Burns is not responsible for his actions and you shall return your verdict in favor of the defendant Burns Detective Agency."

This is a proper instruction for whether or not Troutner deviated from his employer's business was an issue to be submitted to the jury. We are unable to say as a matter of law that such deviation was either slight or marked and unusual.

Troutner had been in the employ of Burns for only a few hours prior to the incidents which gave rise to this case. He was a temporary employee only. The extent of the investigation made by Burns of his background, character, temperament, reliability and experience as a security guard is not shown. The responsibility for making this investigation, and for instructing its guards, was that of Burns.

In the guard manual above referred to is also found the following paragraph dealing with "personal conduct of a guard":

> "Interest in the job is increased by *thinking* security and *acting* security, by *thinking* protection and *acting* protection, by *thinking* prevention and *acting* prevention."

Major Leonard, in commenting on this paragraph, and the fact that the words "thinking and acting" were italicized, testified: "Thinking and acting, that's the biggest thing". He admitted that Troutner was "a security guard" and further said: "At the time it was the special Christmas occasion and Standard Drug had ordered an additional guard for this holiday occasion. The job duties were to patrol the area of the parking lot. Numbers of people were parked on the lot with Christmas packages and so forth. . . ."

While an armed guard might be indicated to accompany a person en route to or from a bank with a sum of money, no necessity has been shown for the arming of a parking lot attendant.

Troutner was employed, instructed, uniformed and armed by Burns the day that he shot plaintiff. The Burns uniform is symbolic of a security guard, a member of a private detective force. To uniform and arm a guard not only cloaks him with the badges of authority, but gives him the extreme means of exercising that authority.

The parking area of Standard being patrolled by Troutner on the day in question was immediately adjacent to the rear of the company's store and the point where the altercation between Williams and plaintiff occurred.

While there is no evidence that Troutner knew Williams, or knew that he was a police officer before being told by Whitt, the fact remains that a violent altercation did occur in the Standard store, resulting in a broken rear door, and continued on the outside and at a point adjacent to the area under patrol by Troutner. When Troutner appeared on the scene he could reasonably have assumed that the disturbance was of some gravity, for the police officer then had a "cocked pistol" leveled at the head of the plaintiff. In addition, a crowd had assembled and the conduct of at least two of its members was such that the officers felt they should be arrested. It was in this setting that Troutner, an armed security guard, acted.

The evidence presents a question of fact. The jury could have decided thereunder that Troutner temporarily departed and deviated from the business of Burns and from the scope of his employment and was engaged in an independent venture of his own when he shot plaintiff. Or they could have decided that his shooting of the plaintiff was done, although mistakenly or ill-advisedly, while engaged upon the business of his employer and with a view of furthering Burns' interest, or from some impulse or emotion which naturally grew out of or was incident to the attempt to perform the master's business.

■ Having concluded that this case must be remanded for a new trial as to the liability of Burns, the court further observes that under the evidence adduced in this case no instruction on the assumption of risk by the plaintiff should have been given. Assuming that Broaddus did make an assault on Williams this constituted a misdemeanor only.

In *Crosswhite* v. *Barnes*, 139 Va. 471, 480, 124 S. E. 242, 245 (1924), it was said:

> "It is outside of the point involved in this case to discuss the rights of an officer seeking to arrest one who is simply fleeing from arrest for a misdemeanor, but we so frequently read in the press of acts of violence by officers in such cases that it is deemed proper to say that such officers have no right to inflict serious bodily harm upon one who is simply fleeing arrest for a misdemeanor."

Manifestly an individual would occupy no higher status under such circumstances than would a police officer.

The judgment of the lower court for the defendant, Standard Drug Company, Inc., is affirmed. Its judgment for the defendant, Clarence E. Williams, growing out of plaintiff's shooting by Troutner is affirmed. Its judgment for the defendant, Clarence E. Williams, growing out of his alleged assault on plaintiff is reversed. Its judgment for the defendant, William J. Burns International Detective Agency, Inc., is reversed. This case is remanded for a new trial, if the parties be so advised, as to the liability of Burns for damages sustained by the plaintiff as a result of being shot by Troutner, and as to the liability of Williams for the damages sustained by the plaintiff as a result of the assault alleged to have been committed on him by Williams.

*Affirmed in part; reversed in part; and remanded.*