Present:  All the Justices

GINA CHIN & ASSOCIATES, INC.

                                        OPINION BY
v.  Record No. 992557      JUSTICE LAWRENCE L. KOONTZ, JR.
                                       November 3, 2000
FIRST UNION BANK


            FROM THE CIRCUIT COURT OF ARLINGTON COUNTY
                  Benjamin N. A. Kendrick, Judge

     In this appeal, we consider whether the trial court erred

in striking the evidence at the conclusion of the plaintiff's

case-in-chief by ruling, as a matter of law, that a bank teller

who participated in a scheme to deposit forged checks was acting

outside the scope of his employment, thus relieving his employer

from civil liability for those acts.

                            BACKGROUND

     Under well settled principles of law, we will review the

evidence in the light most favorable to the plaintiff, the non-

moving party.  See, e.g., Lenders Financial Corp. v. Talton, 249

Va. 182, 188, 455 S.E.2d 232, 236 (1995).

     In 1994, Henry Steven Cardenas was employed as a teller by

First Union Bank.  His duties included, among other things, the

receiving of cash and checks for deposit into the accounts of

the bank's customers.  At the beginning of his employment,

Cardenas received "about two weeks" of training.  During that

training, First Union instructed Cardenas not to accept checks

made payable to businesses for deposit into personal accounts or

to accept checks for more than $7,000 for deposit without a supervisor's approval.

Prior to beginning his employment with First Union, Cardenas was acquainted with Amie Cheryl Lehman, who was dating Cardenas' brother. Shortly after Cardenas began working as a teller, he moved into an apartment with his brother and Lehman. Lehman, who had formerly been a teller at Signet Bank, was employed at that time by Gina Chin & Associates, Inc. (Chin), a food wholesaler, as the firm's accounts payable clerk.

After Cardenas had been working at First Union "a little over a year," Lehman, relying on her knowledge as a former bank teller, requested his assistance in depositing a forged check into her First Union account. The check was drawn on Chin's account at Signet Bank,[1] and was made payable to one of Chin's suppliers. Lehman created the check by entering a false invoice into Chin's accounts payable computer program, which produced the check on a printer. Lehman then forged both the signature of Gina Chin, Chin's president, as drawer and the endorsement of the supplier making the check payable to Lehman.

Cardenas at first refused to assist Lehman, "but then she kept on insisting and insisting and then she convinced me, I

_____

[1]During the course of the ensuing forgery scheme conducted by Lehman and Cardenas, Chin moved its account to Citizen's Bank

2

guess, by offering me some money on the side." Lehman told

Cardenas that "it wouldn't come back to [him] at all" because

she reconciled the bank statements for Chin's account and could

intercept the statements with the forged checks before they came

to the attention of the firm's principals. Cardenas thereafter

deposited the check into Lehman's First Union account. The

drawer bank paid the check, debiting the amount from Chin's

account.

Ultimately, using the forgery scheme outlined above, Lehman

and Cardenas succeeded in depositing $270,488.72 in forged

checks into Lehman's personal account at First Union.[2] Cardenas

received approximately 20 percent of the funds deposited. After

Lehman left her employment with Chin, Signet Bank discovered the

forgery scheme and reported its findings to Chin and the police.

Lehman and Cardenas subsequently were convicted of one count of

bank fraud each in federal court.

On June 11, 1996, Chin filed a motion for judgment against

First Union seeking $270,488.72 in damages resulting from the

forgery scheme of Lehman and Cardenas. Chin alleged that First

---

of Washington, D.C. Checks drawn on both accounts were
deposited into Lehman's First Union account.

[2]The total amount of the forged checks reflected here is
taken from Chin's motion for judgment. Chin concedes in that
pleading that this amount is subject to amendment because some
of the forged checks were apparently deposited in another bank.

Union was negligent when it accepted for payment checks drawn on Chin's accounts bearing both forged signatures of the drawer and forged endorsements of the payees. Chin further alleged that First Union was vicariously liable for Cardenas' criminal acts.

The trial court initially sustained First Union's demurrer to Chin's motion for judgment and entered summary judgment in favor of First Union on the ground that under the factual circumstances asserted by Chin certain provisions of the Uniform Commercial Code barred an action by the drawer of a check against the depository bank. We awarded Chin an appeal from that judgment, reversed it, and remanded the case for further proceedings. Gina Chin & Associates v. First Union Bank, 256 Va. 59, 63, 500 S.E.2d 516, 518 (1998). In doing so, we held that "Chin's motion for judgment pled a cause of action pursuant to §§ 8.3A-404 and -405 of the Uniform Commercial Code, Code §§ 8.1-101 through 8.11-108." Id. at 61, 500 S.E.2d at 517. We explained that pursuant to these statutes the concept of comparative negligence is employed to determine liability to the person sustaining the loss based upon the premise "that all participants in the process have a duty to exercise ordinary care in the drawing and handling of [checks]." Id. at 62, 500 S.E.2d at 517. Thus, in the context of the present case, the ultimate issue of comparative negligence, which is solely a jury issue, centers upon the conduct of First Union through its

4

employees and that of Chin through its employees.  In short, there is no dispute that while First Union accepted the forged checks for payment and Chin permitted access to its checks by its employee who forged them, the ultimate issue still undecided at that point in the proceedings was whether First Union was negligent or whether First Union and Chin were both negligent and, if so, to what comparative extent.

Upon remand, a jury trial was commenced in the trial court on July 17, 1999.  After First Union prevailed on its motion in limine to exclude the anticipated testimony of Chin's expert witness regarding established banking customs and standards, the trial court stated "the primary issue is scope of employment." Chin then proceeded to produce its evidence to the jury.

Cardenas, Lehman, and Donald Chin, Chin's treasurer, were each called as witnesses for Chin.  Consistent with the facts previously related herein, Cardenas and Lehman detailed the scheme to forge the checks and to deposit them into Lehman's account.  Cardenas further testified that after he left his employment with First Union, Lehman continued the forgery scheme using her account at another bank where Cardenas' brother worked as a teller.  Donald Chin testified concerning the failure of Chin to detect the forgery scheme.  At the conclusion of Chin's case-in-chief, the jury was read stipulations of fact, including

the stipulation that Cardenas' acts were not known to his supervisors.[3]

First Union moved to strike Chin's evidence, asserting that Chin had failed to establish that Cardenas was acting within the scope of his employment in knowingly accepting the forged checks for deposit. First Union argued that "although taking these checks may have been incidental to First Union's business because it takes checks for deposit, there was no evidence that it was in furtherance of First Union's interest." First Union contended that this was so because Cardenas willfully violated its policies concerning the deposit of commercial checks into personal accounts and accepting certain checks without management approval. Thus, First Union argued that Cardenas was not acting in furtherance of its interest and, hence, not within the scope of his employment.

Chin, citing Commercial Business Systems, Inc. v. Bell South Services, Inc., 249 Va. 39, 453 S.E.2d 261 (1995), and other cases, responded that the specific wrongful act by the employee need not be in furtherance of the employer's interest

---

[3]First Union had been permitted to call its expert witness out of turn at the end of the first day of the trial, but had not formally begun presenting its case when it moved to strike Chin's evidence. Accordingly, we will not consider the evidence received from that witness in reviewing the trial court's ruling.

so long as the service that the employee was performing at the time was in the course of his employment. Chin asserted that its evidence showed that Cardenas was acting as an employee of First Union when he accepted the forged checks for deposit.

After a lengthy colloquy in which the trial court and counsel for both parties discussed in detail the case law concerning the doctrine of respondeat superior, the trial court sustained First Union's motion to strike Chin's evidence. In the final order dismissing the case with prejudice, the trial court ruled as a matter of law that Cardenas' acts "were not within the scope of the employee's authority, being in contravention of First Union's directives, and they were not within the scope of employment as they were shown not to be in furtherance of First Union's interests; and . . . reasonable persons cannot differ on the conclusion reached herein based on the evidence presented by the Plaintiff, with all inferences most favorable to the Plaintiff." We awarded Chin this appeal.

## DISCUSSION

Initially, we note that the procedural posture of this case, as will be demonstrated, is significant. The case is before us following the trial court's grant of the motion to strike Chin's evidence. In that posture, we are unable to review this case in consideration of all the evidence that may have been produced on the issue in question. Moreover, despite

our consideration of this case in the prior appeal, we are unable to reach the ultimate merits, or lack thereof, of Chin's claims against First Union. However, for the reasons that follow, we will reverse the judgment of the trial court and remand the case for further proceedings.

With respect to an assertion of liability based upon the doctrine of respondeat superior, this Court made the following pertinent observation almost 80 years ago in Davis v. Merrill, 133 Va. 69, 112 S.E. 628 (1922):

> If a person, acting for himself, wilfully and maliciously inflict an injury upon another, he is liable in damages for such injury. And there is no reason why a master should be permitted to turn his business over to servants who have no regard for the public welfare and thereby escape the responsibility which he would otherwise have to bear. It is manifestly right and just that both corporations and individuals be required to answer in damages for wanton and malicious assaults inflicted upon others by their servants, while acting within the scope of the servant's employment and duty, and it matters not whether the act of the servant is due to lack of judgment, the infirmity of temper, or the influence of passion, or that the servant goes beyond his strict line of duty and authority in inflicting such injury . . . .

Id. at 74, 112 S.E. at 630-31.

Almost from its first consideration by the courts of this Commonwealth, however, the determination of the issue whether the employee's wrongful act was within the scope of his employment under the facts of a particular case has proved "vexatious." See, e.g., Kidd v. DeWitt, 128 Va. 438, 443, 105

8

S.E. 124, 125 (1920); <u>Appalachian Power Company v. Robertson</u>, 142 Va. 454, 456, 129 S.E. 224, 224 (1925).

We have defined "scope of employment" in the following terms:

> Generally, an act is within the scope of the employment if (1) it was expressly or impliedly directed by the employer, or is naturally incident to the business, and (2) it was performed, although mistakenly or ill-advisedly, <u>with the intent to further the employer's interest</u>, or from some impulse or emotion that was the natural consequence of an attempt to do the employer's business . . . .

<u>Kensington Associates v. West</u>, 234 Va. 430, 432, 362 S.E.2d 900, 901 (1987)(emphasis added). The emphasized language in this definition is the focal point of First Union's assertion in the present case. First Union apparently interprets this language to require that the specific act which caused the injury be performed by the employee with an intent to benefit the employer. At first blush, this language is susceptible to such an interpretation. However, our prior decisions do not support that interpretation by implication, <u>see</u>, <u>e.g.</u>, <u>Plummer v. Center Psychiatrists, Ltd.</u>, 252 Va. 233, 238, 476 S.E.2d 172, 175 (1996)(counselor engaging in unethical sexual relationship with patient was potentially acting within scope of employment); <u>Commercial Business Systems,</u> 249 Va. at 46, 453 S.E.2d at 266 (employee violating company rule against self-dealing and accepting illegal bribes to award contracts was potentially

9

acting within the scope of employment), and we expressly reject it now.

In cases involving a willful and wrongful act of an employee, a narrow and literal reading of the language in this definition, which would create a patent conflict within it, is not to be applied as a matter of law to the facts of a particular case. The present case and First Union's assertions in support of its motion to strike Chin's evidence are illustrative of the point. Where an employee commits a willful and wrongful act that results in injury to others, simple logic suggests that such employee generally does not do so "with the intent to further the employer's interest." That is to say, the employee generally does not intend to benefit the employer.

Here, it may well be reasonable to conclude that a bank teller does not intend to further the interest of his employer bank when he knowingly accepts forged checks for deposit for his own gain. However, that does not resolve the legal issue presented, as a matter of law, to the trial court upon a motion to strike the injured party's evidence. Rather, it should be apparent that the proper application of this definition in the context of the doctrine of respondeat superior does not resolve into a simplistic determination that an employee's willful and wrongful act was not done with the intent to further the employer's interest or to benefit the employer in some way. Any

10

doubt that may have existed in that regard was clearly resolved in Commercial Business Systems and in Plummer.

As in the present case, we recognize that the difficulty in applying this definition to the facts of a particular case frequently arises where "[t]he real inquiry is, was the question as to whether [the employee] was acting within the scope of his employment . . . one to be determined by the Court, or was it a question of fact to be submitted to, and determined by, the jury?" Crowell v. Duncan, 145 Va. 489, 500, 134 S.E. 576, 579 (1926). In that regard, a motion to strike requires the trial court to test the evidence against the applicable burdens of production before permitting the jury to weigh that evidence against the applicable burden of persuasion.

Settled principles guide the trial court's considerations. While the plaintiff has the burden of persuasion on the issue whether the employee was acting within the scope of his employment at the time of the act complained of, we have consistently held that proof of the employment relationship creates a prima facie rebuttable presumption of the employer's liability. McNeill v. Spindler, 191 Va. 685, 694-95, 62 S.E.2d 13, 17-18 (1950). Thus, "[w]hen an employer-employee relationship has been established, 'the burden is on the [employer] to prove that the [employee] was not acting within the scope of his employment when he committed the act complained

11

of, and . . . if the evidence leaves the question in doubt it becomes an issue to be determined by the jury.'" Kensington Associates, 234 Va. at 432-33, 362 S.E.2d at 901 (quoting Broaddus v. Standard Drug Co., 211 Va. 645, 653-54, 179 S.E.2d 497, 504 (1971)); see also Plummer, 252 Va. at 235, 476 S.E.2d at 174; Turner v. Burford Buick Corp., 201 Va. 693, 698, 112 S.E.2d 911, 915 (1960).

Admittedly, the trial court's task may be particularly difficult in cases in which the injury is caused by an intentional, often criminal, tortious act which clearly would not have been contemplated by the employer as being within the scope of employment, but which nonetheless was performed incident to the employment and even facilitated thereby.[4]  Such cases invoke consideration of whether the employee deviated from the scope of his employment because of an "external, independent, and personal motive . . . to do the act upon his

---

[4]An alternate approach in such circumstances has been to assign liability to the employer not vicariously through respondeat superior, but directly through the torts of negligent hiring and negligent retention. See, e.g., J. v. Victory Tabernacle Baptist Church, 236 Va. 206, 208-09, 372 S.E.2d 391, 393 (1988)(confirming prior recognition of the tort of negligent hiring); Philip Morris Inc. v. Emerson, 235 Va. 380, 401, 368 S.E.2d 268, 279 (1988)(recognizing tort of negligent retention). Chin did not allege either of these torts in its motion for judgment.  Chin did allege negligent failure to supervise as a theory of liability in its motion for judgment, but abandoned that claim at the outset of trial on remand.  Accordingly, the viability of that claim is not before us in this appeal.

12

own account." Broaddus, 211 Va. at 653, 179 S.E.2d at 503-04. In that regard, we have distinguished between the motive of the employee and the relevant question whether the service performed was within the scope of employment. In making this distinction, we have held that the motive of the employee in committing the act complained of is not determinative of whether it took place within the scope of the employment relationship. Commercial Business Systems, 249 Va. at 45, 453 S.E.2d at 266; Tri-State Coach Corp. v. Walsh, 188 Va. 299, 305-06, 49 S.E.2d 363, 366 (1948). Rather, the issue is "whether the service itself, in which the tortious act was done, was within the ordinary course of such business." Davis v. Merrill, 133 Va. 69, 78, 112 S.E. 628, 631 (1922); accord Commercial Business Systems, 249 Va. at 44, 453 S.E.2d at 265.

In Commercial Business Systems, an employee, in violation of conflict of interest rules established by his employer, created a business to work with companies that provided services to his employer. The employee then used his position as a contract negotiator and administrator to funnel business to suppliers who agreed to work with his company and pay him illegal "kickbacks." 249 Va. at 43, 453 S.E.2d at 265. We held that these facts did not "conclusively establish that [the employee] was not acting within the scope of his employment." Id. at 46, 453 S.E.2d at 266. Although the employee's motive

13

was to advance his self-interest, rather than the interest of his employer, he was nonetheless "performing his duties . . . in the execution of the services for which he was employed." Id.

We emphasize that the employee's improper motive is not irrelevant to the issue whether the act was within the scope of employment. Rather, it is merely a factor to be considered in making that determination, and, unless the deviation from the employer's business is slight on the one hand, or marked and unusual on the other, but falls instead between those two extremes, the question is for the jury. McNeill, 191 Va. at 695, 62 S.E.2d at 18; accord Kensington Associates, 234 Va. at 433, 362 S.E.2d at 902. Thus, in Commercial Business Systems, we held that "the evidence presents a jury issue whether [the employee] acted within the scope of his employment when he committed the wrongful acts." 249 Va. at 46, 453 S.E.2d at 266; see also Plummer, 252 Va. at 238, 476 S.E.2d at 175.

Applying these principles, the issue presented to the trial court by First Union's motion to strike was whether the evidence presented by Chin was such that, as a matter of law, a reasonable juror could not find that an employer-employee relationship existed between Cardenas and First Union or that, although such a relationship existed, Cardenas was acting within the scope of that employment at the time of the commission of the acts which injured Chin. First Union does not contest that

14

Chin produced clear evidence that established the necessary employment relationship between Cardenas and First Union. Accordingly, Chin's evidence established a <u>prima</u> <u>facie</u> case of First Union's liability.

First Union contends, however, that Chin's evidence was also sufficient to meet First Union's burden of production on the issue whether Cardenas' acts were nevertheless outside the scope of that employment and, moreover, that this evidence was sufficient to rebut the presumption of liability as a matter of law. We disagree.

First Union asserts that Chin's evidence establishes that Cardenas' wrongful acts were not "expressly or impliedly directed by the employer" because he violated directives in accepting commercial checks for deposit into a personal account, in failing to obtain a manager's approval to accept high value checks for deposit, and in knowingly accepting checks for deposit with forged endorsements. This assertion is without merit because the act need not be expressly or impliedly directed by the employer in order for the act to occur within the scope of the employment. Similarly, an act committed in violation of an employer's direction is not always beyond the scope of the employment. Rather, as previously noted, the test is "whether the service itself, in which the tortious act was done, was within the ordinary course of" the employer's

business. In this instance, it is clear that accepting checks for deposit by a bank teller is a service within the ordinary course of First Union's banking business.

First Union further asserts that Chin's evidence also establishes that Cardenas was acting exclusively for his own benefit and that of Lehman. Thus, First Union contends that Cardenas was acting outside the scope of his employment because he had an "external, independent, and personal motive" to perform the act.

There can be no doubt that Cardenas was not steadfast in the performance of his duties and obligations to his employer when he chose to participate in a criminal scheme to accept forged checks for deposit. Cardenas was acting out of self-interest in participating in Lehman's scheme, and his conduct was "outrageous and violative of his employer's rules." Commercial Business Systems, 249 Va. at 46, 453 S.E.2d at 266. Nonetheless, it is clear that in doing so he was performing a normal function of a bank teller in accepting checks for deposit.

In sum, First Union's assertions, and the apparent basis of the trial court's decision to strike Chin's evidence and to award summary judgment to First Union, are premised not on the failure of Chin to present sufficient evidence to establish a prima facie case of the necessary employment relationship at the

16

time of the injury to Chin, but on the failure of that evidence to prove that the acts complained of were committed within the scope of that employment. As we have explained, Chin did not have the burden of presenting evidence that Cardenas' acts were within the scope of his employment. Rather, having established that the employment relationship existed, Chin was entitled to have the case go forward with the burden on First Union to prove that Cardenas acted <u>outside</u> the scope of his employment.

The procedural posture of the case, as we noted above, is significant. Chin's evidence, without any additional evidence offered by First Union, was sufficient to establish a jury issue whether Cardenas acted within the scope of his employment. That issue therefore, on the evidence presented, did not lend itself to a resolution as a matter of law by the trial court.

CONCLUSION

For these reasons, we hold that the trial court erred in sustaining First Union's motion to strike Chin's evidence and awarding summary judgment to First Union. Accordingly, we will reverse the judgment of the trial court and remand the case for further proceedings consistent with the views expressed in this opinion.

<u>Reversed and remanded</u>.