UNPUBLISHED

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 16-1896

CHANTAL LACASSE,

Plaintiff – Appellant,

v.

DIDLAKE, INC.,

Defendant – Appellee,

and

ROY EVO,

Defendant.

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria. Claude M. Hilton, Senior District Judge. (1:15-cv-01358-CMH-TCB)

Submitted: October 4, 2017                    Decided: January 10, 2018

Before WILKINSON, KEENAN, and FLOYD, Circuit Judges.

Affirmed by unpublished per curiam opinion.

John C. Cook, Broderick C. Dunn, Philip C. Krone, COOK CRAIG & FRANCUZENKO, PLLC, Fairfax, Virginia, for Appellant. Karen L. Vossler, Joleen R. Okun, OGLETREE DEAKINS NASH SMOAK & STEWART, P.C., Washington, D.C.,

for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Appellant–plaintiff Chantal Lacasse appeals from the district court's order granting summary judgment in favor of her employer, Didlake, Inc., on various claims based on Virginia common law, Title VII of the Civil Rights Act of 1964, and the Americans with Disabilities Act ("ADA"). For the following reasons, we affirm.

I.

Didlake, Inc., is a 501(c)(3) non-profit organization that provides rehabilitative services to, creates employment options for, and renders other direct assistance to over 2,000 individuals with disabilities. In addition to helping its beneficiaries secure employment elsewhere, Didlake directly employs over 800 people through its janitorial services contracts with federal agencies. Didlake maintains a comprehensive anti–harassment policy, which every employee receives and must read at the start of employment. Didlake reviews the policy annually with all employees, and sends its human resources department to conduct on-site, small-group training on how to recognize and report impermissible harassing and retaliatory conduct. Susie Kennedy, Didlake's Manager of Labor and Employee Relations, also testified that Didlake's human resources department carefully adapted the training materials to contain fewer legal terms so that they can be understood by all of its employees.

Chantal Lacasse, a 26-year-old woman with epilepsy and learning disabilities, was first a beneficiary of Didlake's job placement services. In 2013, Didlake directly employed her as a janitor at the Defense Logistics Agency at Fort Belvoir, Virginia

3

("DLA"). Despite her disabilities, the Virginia Department of Aging and Rehabilitative Services determined her eligible to work in a mainstream job in a supported employment environment—for example, with the assistance of a job coach. Didlake provided Lacasse with a job coach named Lyn Cardona, who helped Lacasse secure the DLA position and provided her with ongoing and onsite employment support services. As a janitor at the DLA, Lacasse was supervised by Didlake Janitorial Supervisor Brenda Morales. Morales was in turn supervised by Didlake Project Manager Roy Evo. Evo, who had over twenty years of relevant experience, was primarily responsible for ensuring that Didlake was performing to the government's satisfaction.

Lacasse alleges that on Thursday, August 15, 2013, Evo found her in a supply closet near the end of her shift and kissed her. According to Lacasse, the incident ended abruptly because someone knocked on the closet door. Lacasse did not tell anyone of this incident until a few days later on Saturday, August 17, 2013, when she told her parents. At work the following Monday, August 19, 2013, Lacasse told two individuals—a non-supervisory janitorial co-worker and an individual who works at the DLA but is not a Didlake employee—that Evo kissed her. These individuals relayed what Lacasse told them to Evo, who immediately reported these allegations to Didlake's human resources department. Because this was at the end of Lacasse's shift, the human resources department arranged to interview her the following morning.

On August 20, 2013, Kennedy and Cardona privately interviewed Lacasse to corroborate her claims. While the investigation continued, Lacasse was placed on paid administrative leave so she would avoid any further contact with Evo. Didlake kept

Lacasse apprised of the status of the investigation throughout its pendency, and advised her of resources for assistance and support. Kennedy then interviewed Evo who denied the allegations, and several other potential witnesses who confirmed that Evo was interviewing job candidates during the time period in question on August 15, 2013. Evo was interviewing job candidates approximately from 10:40 a.m. to shortly after 12:00 p.m., and Lacasse's timecard showed that she left the building at 11:57 a.m. Based on Evo's confirmed alibi, Kennedy reported to her supervisor and Didlake's senior staff that she could not corroborate Lacasse's allegations. The U.S. Army Criminal Investigation Command also launched an independent investigation. During its own independent investigation, the government suspended Evo's access to the DLA. Because Evo could no longer access any secure government sites, Didlake placed Evo on administrative leave, and Evo subsequently resigned from his position.[*] Egberto Garcia took over as Didlake's Project Manager at the DLA in December 2013.

On September 30, 2013, Lacasse returned to work. On Lacasse's first day back to work, Kennedy, Morales, and Cardona all personally met with her to review how she could report her concerns about other people's behavior. Additionally, Didlake arranged for an exception to be made in the DLA's policy prohibiting cell phones so Lacasse could

---

[*] The record tells an incomplete story regarding what came out of the government's investigation. Around December 2013, the U.S. Army Criminal Investigation Command completed its investigation and forwarded the case to the Office of the Staff Judge Advocate and the DLA Commander for further action after finding "the offenses of the Abusive Sexual Contact [sic] and Making a False Official Statement." J.A. 414. The record shows that Evo was no longer employed by Didlake around this time but contains no further information.

5

carry her cell phone with her at all times, call her family if necessary, and feel more comfortable adjusting back to work. Didlake also offered Lacasse an opportunity to work with a more experienced female worker. Lacasse reported being very happy with this opportunity, and the periodic time study conducted by Didlake showed an increase in her productivity, for which she received a salary raise in November 2013.

In December 2013, however, Lacasse's workplace behavior began to deteriorate. Between December 2013 and late April 2014, Lacasse was counseled and disciplined four times for inappropriate workplace behavior. In December 2013, Lacasse received her first written counseling after Morales caught her socializing with the DLA security guards outside of her assigned work area during work hours. On February 20, 2014, Lacasse received her second written counseling after she called her co-worker with mental and physical disabilities a "monkey." On April 9, 2014, Lacasse received another written counseling, because a male co-worker complained that she was emasculating him by calling him "Granny" and "Benita." Lastly, on April 21, 2014, Lacasse received her fourth written counseling for spreading rumors that a Didlake employee impregnated a second Didlake employee. The fourth counseling culminated in a three-day paid suspension. By policy, Didlake places an employee with a disability on a paid suspension when prior counseling fails to resolve an ongoing behavioral issue to allow the employee to regroup and become successful in the future.

Lacasse resigned from her DLA position on May 19, 2014, after reporting her unhappiness with her job. After Lacasse resigned, Didlake sought to assist her in determining her next steps, but Lacasse declined this offer. Lacasse filed suit against

6

Didlake, alleging eight causes of action: (1) battery, (2) assault, (3) false imprisonment, (4) intentional infliction of emotional distress, (5) hostile work environment in violation of Title VII, (6) retaliation in violation of Title VII, (7) disability discrimination in violation of the ADA, and (8) retaliation in violation of the ADA. Although Lacasse included Evo in her state law claims, because he was never served with process, the district court dismissed Lacasse's claims against him. Additionally, the district court granted summary judgment in Didlake's favor on all counts. Lacasse appeals summary judgment on all counts except for her retaliation claims.

## II.

"We review a district court's decision to grant summary judgment de novo, applying the same legal standards as the district court, and viewing all facts and reasonable inferences therefrom in the light most favorable to the nonmoving party." *T–Mobile Ne. LLC v. City Council of City of Newport News, Va.*, 674 F.3d 380, 384–85 (4th Cir. 2012) (internal quotation marks omitted). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). We may affirm the district court "on any basis fairly supported by the record." *Lawson v. Union Cty. Clerk of Court*, 828 F.3d 239, 247 (4th Cir. 2016) (internal quotation marks omitted) (quoting *Eisenberg v. Wachovia Bank, N.A.*, 301 F.3d 220, 222 (4th Cir. 2002)).

We first turn to Lacasse's state law claims against Didlake for assault, battery, false imprisonment, and intentional infliction of emotional distress under the theory of

7

*respondeat superior*. In reviewing these claims, we are bound by Virginia law as articulated by Virginia courts. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). Finding no error with the district court's ultimate conclusion that Evo's alleged actions fell outside the scope of his employment, we affirm.

Under Virginia's doctrine of *respondeat superior*, "an employer is liable for the tortious acts of its employee if the employee was performing his employer's business and acting within the scope of his employment when the tortious acts were committed." *Plummer v. Ctr. Psychiatrists, Ltd.*, 476 S.E.2d 172, 173 (Va. 1996) (citation omitted). An employee's act is within the scope of his employment

> if (1) it was expressly or impliedly directed by the employer, or is naturally incident to the business, and (2) it was performed, although mistakenly or ill-advisedly, with the intent to further the employer's interest, or from some impulse or emotion that was the natural consequence of an attempt to do the employer's business, "and did not arise wholly from some external, independent, and personal motive on the part of the [employee] to do the act upon his own account."

*Kensington Assocs. v. West*, 362 S.E.2d 900, 901 (Va. 1987) (alteration in original) (quoting *Broaddus v. Standard Drug Co.*, 179 S.E.2d 497, 504 (Va. 1971)). As the Supreme Court of Virginia has observed, the determination of whether the employee acts within the scope of his employment turns on the facts of the particular case and can be "vexatious." *Gina Chin & Assocs., Inc. v. First Union Bank*, 537 S.E.2d 573, 576–77 (Va. 2000) (internal quotation marks and citations omitted).

The Supreme Court of Virginia has consistently held that "[w]hile the plaintiff has the burden of persuasion on the issue whether the employee was acting within the scope of his employment at the time of the act complained of, . . . proof of the employment

8

relationship creates a prima facie rebuttable presumption of the employer's liability." *Gina Chin*, 537 S.E.2d at 577 (citing *McNeill v. Spindler*, 62 S.E.2d 13, 17–18 (Va. 1950)). Once the employer-employee relationship has been established, the burden is on the employer "to prove that the employee was *not* acting within the scope of his employment when he committed the act complained of, and . . . if the evidence leaves the question in doubt it becomes an issue to be determined by the jury." *Id.* at 577–78 (emphasis in original) (internal quotation marks, citations, and alterations omitted).

Whether an employee acted within the scope of his employment cannot be determined in a simplistic manner. "It is well established that the simple fact that an employee is at a particular location at a specific time as a result of his employment is not sufficient to impose *respondeat superior* liability on the employer." *Blair v. Def. Servs., Inc.*, 386 F.3d 623, 627 (4th Cir. 2004) (citing *Cary v. Hotel Rueger, Inc.*, 81 S.E.2d 412, 424 (Va. 1954)). Similarly, the employee's improper motive behind his tortious acts "is not determinative of whether [the act] took place within the scope of the employment relationship," but is "merely a factor to be considered[.]" *Gina Chin*, 537 S.E.2d at 578 (citations omitted). Instead, the heart of the inquiry—as the Supreme Court of Virginia has pronounced in *Gina Chin* and as we have applied in *Blair*, 386 F.3d at 627—is "whether the service itself, in which the tortious act was done, was within the ordinary course of [the employer's] business," *Gina Chin*, 537 S.E.2d at 578 (quoting *Davis v. Merrill*, 112 S.E. 628, 631 (Va. 1922)).

Here, the district court granted summary judgment in Didlake's favor on Lacasse's state law claims, but failed to apply the test as set forth in *Gina Chin*. Instead, the court

9

relied on *Richmond Newspaper*, which discussed whether an injury arose out of employment for purposes of the Virginia Workers' Compensation Act and therefore is not directly relevant to the determination of tort liability under *respondeat superior*. *See Richmond Newspapers, Inc. v. Hazelwood*, 457 S.E.2d 56, 58 (Va. 1995). The district court observed that "the only potential impetus for Mr. Evo's alleged actions [was] some 'personal motive,' " and then concluded that "[w]hen an assault 'is personal to the employee . . . the injury does not arise out of the employment.' " *Lacasse v. Didlake, Inc.*, 194 F. Supp. 3d 494, 501 (E.D. Va. 2016) (quoting *Richmond Newspapers*, 457 S.E.2d at 58). In doing so, the district court considered Evo's potentially improper and personal motive as the dispositive factor in finding that Evo's alleged actions fell outside the scope of his employment. The decisions of the Supreme Court of Virginia make it clear that an employee's improper motive cannot be determinative; rather, it is merely a factor. Thus, the court's analysis was erroneous.

Nevertheless, when we analyze Lacasse's state law claims under *Gina Chin*, it becomes clear that Evo's alleged actions fell outside the scope of his employment with Didlake. The alleged sexual harassment deviated so significantly from Evo's expected duties as a Project Manager that it could not have occurred in the ordinary course of Didlake's business. *See Blair*, 386 F.3d at 628 (holding that a janitorial worker's sexual assault of a student deviated from his duties and was clearly outside of the scope of his employment). Moreover, Evo neither gained nor possessed knowledge relevant to the assault through the performance of his job duties. *Cf. Plummer*, 476 S.E.2d at 174 (holding that a psychiatrist who sexually assaulted a patient "while he was

10

performing . . . the services for which he was employed, [such as] counseling and therapy" did so in the course of his employment); *Heckenlaible v. Va. Peninsula Reg'l Jail Auth.*, 491 F. Supp 2d. 544, 511 (E.D. Va. 2007) (imposing *respondeat superior* liability on the jail because the employee's "duties as a correctional officer required him to observe inmates in the shower, and the alleged sexual assault occurred after he observed [the plaintiff] showering"). Evo's alleged acts, if true, merely would have occurred at his place of employment, and that is insufficient to establish Didlake's *respondeat superior* liability under Virginia law. *See Blair*, 386 F.3d at 627.

Because Evo's alleged actions fell outside the scope of his employment with Didlake, we conclude that Didlake is not liable under *respondeat superior*. Accordingly, we affirm summary judgment in Didlake's favor on Lacasse's state law claims.

III.

Next, we examine Lacasse's hostile work environment claim under Title VII of the Civil Rights Act of 1964. Under Title VII, it is unlawful for an employer "to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). We have held that "[b]ecause 'an employee's work environment is a term or condition of employment, Title VII creates a hostile working environment cause of action.' " *Crockett v. Mission Hosp., Inc.*, 717 F.3d 348, 354 (4th Cir. 2013) (quoting *EEOC v. R&R Ventures*, 244 F.3d 334, 338 (4th Cir. 2001)). Because we find that Didlake has a valid affirmative defense, we affirm.

11

To establish a hostile work environment claim based on sexual harassment under Title VII, a plaintiff must show that the harassment was (1) unwelcome, (2) based on the plaintiff's sex, (3) sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment, and (4) imputable to the employer based on some factual basis. *Id.* at 354 (citing *Spicer v. Va. Dep't of Corr.*, 66 F.3d 705, 709–10 (4th Cir. 1995) (en banc)).

In analyzing the fourth element of a hostile work environment claim, an employer's liability for a supervisor's harassing conduct turns on whether or not the supervisor's harassment leads to a tangible employment action. *Vance v. Ball State Univ.*, 133 S. Ct. 2434, 2439 (2013). The employer is strictly liable for the supervisor's harassing conduct if the supervisor's harassment leads to a tangible employment action— hiring, firing, failing to promote, reassignment with significantly different responsibilities, decision causing a significant change in benefits, or any other significant change in employment status. *Id.* at 2442. Even if the supervisor's harassment does not lead to a tangible employment action, the employer may be vicariously liable unless the employer is able to establish a *Faragher–Ellerth* affirmative defense. *Id.* at 2439 (first citing *Faragher v. Boca Raton*, 524 U.S. 775, 807 (1998); and then citing *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)). A valid *Faragher–Ellerth* affirmative defense exists if (1) "the employer exercised reasonable care to prevent and correct any harassing behavior," and (2) "the plaintiff unreasonably failed to take advantage of the preventive or corrective opportunities that the employer provided." *Id.*

12

Here, when applying these principles and even viewing the evidence in the light most favorable to Lacasse, Didlake cannot be strictly or vicariously liable for Evo's alleged conduct. At the outset, because Evo never took any tangible employment action against Lacasse, Didlake cannot be held strictly liable for any of his alleged actions. *Vance*, 133 S. Ct. at 2448. Additionally, we conclude that Didlake escapes any other vicarious liability that may arise from Evo's alleged conduct, because it can satisfy the two prongs of the *Faragher–Ellerth* affirmative defense.

First, Didlake exercised reasonable care first to prevent and then to correct any harassing behavior by its employees. Like many other organizations, Didlake has instituted a comprehensive anti-harassment policy that was disseminated to its rank and file employees and enforced through its human resources department. *See EEOC v. Xerxes Corp.*, 639 F.3d 658, 669 (4th Cir. 2011) ("The institution and enforcement of [an anti-harassment] policy, in conjunction with an adequate complaint procedure, aid the employer in establishing that it has exercised reasonable care to prevent discrimination." (alteration in original) (internal quotation marks omitted) (quoting *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 187 (4th Cir. 2001)). These policies were aimed at preventing harassment in the first instance. Every employee receives Didlake's Policies and Procedures that cover sexual harassment at the start of his or her employment. Moreover, Didlake conducts on-site, small-group training for its employees at the DLA. Didlake's anti-harassment training material reiterates Didlake's commitment as an equal opportunity employer, trains the employees on how to recognize various kinds of

13

impermissible harassing and retaliatory conduct, and encourages the employees to report harassment to Didlake's human resources department.

In addition to establishing such preventive measures, Didlake also enforced its policies and took corrective actions in the wake of Lacasse's allegations. Didlake's human resources representatives promptly investigated Lacasse's allegations by interviewing Lacasse, Evo, and several other witnesses. Didlake also swiftly placed Lacasse on paid administrative leave to ensure she did not have any contact with Evo during the investigation. Didlake's actions show that its policies were neither " 'mere promulgation' of an anti-harassment policy" nor administered in bad faith. *Spriggs*, 242 F.3d at 187. Therefore, we find that Didlake exercised reasonable care to prevent and correct its employees' harassing conduct, satisfying the first element of the affirmative defense to Lacasse's hostile work environment claim.

As to the second prong of *Faragher–Ellerth*—which the district court failed to analyze—Didlake met its burden to show that Lacasse unreasonably failed to take advantage of the preventive or corrective opportunities that the employer provided by showing that Lacasse failed to follow the established complaint procedure. "[P]roof that a plaintiff employee failed to follow a complaint procedure 'will normally suffice to satisfy the employer's burden under the second element of the defense.' " *Brown v. Perry*, 184 F.3d 388, 395 (4th Cir. 1999) (quoting *Ellerth*, 524 U.S. at 765). Lacasse shared her allegation with two non-supervisory individuals, one of whom was not even a Didlake employee, but never with anyone in the official reporting channel. These

14

individuals relayed the allegations to Evo, who immediately self-reported the allegation to Didlake. We conclude that Didlake satisfied the second prong of *Faragher–Ellerth*.

Therefore, we hold that Didlake has established a valid affirmative defense to Lacasse's hostile work environment claim and affirm summary judgment in Didlake's favor on Lacasse's Title VII claim.

IV.

Lastly, we turn to Lacasse's discrimination claim under the ADA. "The ADA prohibits a covered employer from discriminating 'against a qualified individual with a disability because of the disability of such individual.' " *EEOC v. Stowe–Pharr Mills, Inc.*, 216 F.3d 373, 377 (4th Cir. 2000) (quoting 42 U.S.C. § 12112(a)). Lacasse alleges Didlake forced her to quit by making her working conditions intolerable after she made her sexual harassment allegations with counseling sessions that were punitive for someone with a cognitive learning disability. We find Lacasse's argument unpersuasive.

To establish a prima facie case for disability discrimination under the ADA, a plaintiff must prove: (1) that she has a disability, (2) that she is a "qualified individual" for employment in question, and (3) that her employer discharged her or took other adverse employment action because of her disability. *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 572 (4th Cir. 2015). A constructive discharge—an allegation that the employer made the employee's working conditions so intolerable that she was forced to quit her job—may constitute an adverse employment action. *See Holsey v. Armour & Co.*, 743 F.2d 199, 209 (4th Cir. 1984). To prove a constructive discharge, the plaintiff

15

must show: (1) that the employer's actions were deliberate, and (2) that working conditions were intolerable. *Heiko v. Colombo Sav. Bank, F.S.B.*, 434 F.3d 249, 262 (4th Cir. 2006). We examine whether an employment environment is intolerable "from the objective perspective of a reasonable person." *Id.* at 262 (citing *Williams v. Giant Food Inc.*, 370 F.3d 423, 434 (4th Cir. 2004)). "[M]ere dissatisfaction with work assignments, a feeling of being unfairly criticized, or difficult or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign." *Id.* (quoting *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 378 (4th Cir. 2004)).

When we apply these principles to Lacasse's ADA claim, we see neither Didlake's deliberate attempt to force Lacasse to quit nor objectively intolerable working conditions necessary to prove a constructive discharge claim. Contrary to Lacasse's claims of intolerable working conditions, the record shows that, between September 2013 and December 2013, Didlake proactively assisted her transition back to work from paid administrative leave after her sexual harassment allegations. Lacasse's immediate supervisor, her job coach, and Didlake's human resources director met with Lacasse personally to encourage her to report any concerns about other people's behaviors to them. Didlake even sought and obtained an exception to the DLA's policy so that Lacasse could carry her cell phone with her at all times. Lacasse was further paired with a more experienced female co-worker so that she could feel more comfortable transitioning back to work. And when the time study revealed an increase in Lacasse's productivity, Didlake increased her salary according to her increased productivity.

16

Moreover, Lacasse's voluntary resignation sprung from her own dissatisfaction with a series of counseling sessions and suspension, which resulted from her own inappropriate workplace behavior. *See Williams*, 370 F.3d at 434. Beginning in December 2013 and until April 2014, Lacasse was disciplined for inappropriate workplace behavior four times. Lacasse was counseled in each occasion, and her last counseling led to a three-day suspension from work. Even taken in the light most favorable to Lacasse, these facts are insufficient to support a constructive discharge claim. *See Williams*, 370 F.3d at 434 (concluding that plaintiff's allegations that "her supervisors yelled at her, told her she was a poor manager and gave her poor evaluations, chastised her in front of customers, and once required her to work with an injured back," even if true, were insufficient to establish a constructive discharge claim).

Additionally, we are not persuaded by Lacasse's argument that these counseling sessions and her paid suspension were meant to be more punitive than corrective. As Kennedy testified during her deposition, Didlake took these actions because Lacasse's behavior was affecting and hurting her co-workers. *See* J.A. 183 ("It is when other individuals are being hurt by her behaviors that different action was taken."). Ultimately, Didlake's actions were designed to correct inappropriate workplace behavior as soon as possible, and to provide the employees time to regroup and be successful in the future, not to punish those employees.

We therefore affirm summary judgment in Didlake's favor on Lacasse's ADA claim.

17

V.

We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before the court, and argument would not aid the decisional process. For the reasons set forth above, the district court's order granting summary judgment in Didlake's favor is

*AFFIRMED.*