COURT OF APPEALS OF VIRGINIA

Present: Chief Judge Decker, Judges O'Brien and AtLee
Argued at Fredericksburg, Virginia


H.C.

v.      Record No. 0521-23-4

POTOMAC HOSPITAL CORPORATION
 OF PRINCE WILLIAM, d/b/a SENTARA
 NORTHERN VIRGINIA MEDICAL CENTER

OPINION BY
CHIEF JUDGE MARLA GRAFF DECKER
JUNE 4, 2024

FROM THE CIRCUIT COURT OF PRINCE WILLIAM COUNTY
Tracy C. Hudson, Judge

Michelle S. Kallen (Jeremy B. Gordon; Craig Juraj Curwood;
Samantha R. Galina; Jenner & Block LLP; Butler Curwood, on
briefs), for appellant.

Elaine D. McCafferty (Donna L. Foster; Woods Rogers Vandeventer
Black PLC, on brief), for appellee.

Amicus Curiae: The Virginia Chapter of the National Organization
for Women (Juli M. Porto; Alexandra Roskowinski, Third Year
Law Student; Blankingship & Keith, P.C., on brief), for appellant.

Amicus Curiae: Virginia Trial Lawyers Association (John E.
Davidson; Davidson & Kitzmann, PLC, on brief), for appellant.

Amicus Curiae: Virginia Hospital & Healthcare Association
(Kimberly W. Daniel; Jonathan M. Sumrell; Hancock, Daniel &
Johnson, P.C., on brief), for appellee.


H.C.[1] appeals a ruling granting the motion to strike of Potomac Hospital Corporation of

Prince William (Potomac) at the close of all the evidence at trial. That ruling resulted in

dismissing Potomac from H.C.'s suit for damages following a sexual battery committed against

---

[1] The trial court ruled in the proceedings below that the plaintiff-appellant was entitled to proceed anonymously. That ruling is not challenged on appeal.

her by a registered nurse employed by Potomac. H.C. argues that the trial court erred by ruling as a matter of law that the nurse's actions were outside the scope of his employment and, as a result, that Potomac was not vicariously liable for those actions under the doctrine of respondeat superior. Applying clearly established precedent, we hold that the court did not err by granting the motion. Accordingly, we affirm the ruling dismissing Potomac from the lawsuit.

BACKGROUND[2]

H.C. sued Potomac and Frederick Yeboah for a sexual battery that Yeboah committed against H.C. while she was an inpatient at Potomac's Sentara Northern Virginia Medical Center (Sentara Hospital).[3] The complaint alleged that Potomac was vicariously liable for Yeboah's acts under the theories of respondeat superior and agency. *See generally Com. Bus. Sys. v. Bellsouth Servs.*, 249 Va. 39, 44 (1995) (explaining that respondeat superior principles, if applicable, permit "an agent's tortious act" to be "imputed to" his employer).[4]

---

[2] This opinion details the relevant facts and inferences in the light most favorable to the plaintiff, H.C., because this case involves a ruling on a motion to strike. *See Dill v. Kroger Ltd. P'ship I*, 300 Va. 99, 109 (2021). This approach is tempered, however, by the "seminal principle that a litigant can rise no higher than the 'facts within [her] own knowledge and . . . to which [she] has testified.'" *Smith v. Commonwealth*, 72 Va. App. 523, 543 n.7 (2020) (alterations in original) (quoting *Travis v. Bulifant*, 226 Va. 1, 4-5 (1983) (quoting *Massie v. Firmstone*, 134 Va. 450, 462 (1922))).

[3] H.C. also named Sentara Healthcare as a defendant but nonsuited her claims against Sentara Healthcare prior to trial.

[4] None of the counts alleged that Potomac was directly liable under theories such as negligent hiring, supervision, or retention. *See generally Parker v. Carilion Clinic*, 296 Va. 319, 348 n.15 (2018) (distinguishing between vicarious and direct liability); *Gina Chin & Assocs. v. First Union Bank*, 260 Va. 533, 543 n.4 (2000) (noting that, separate from respondeat superior claims, the Court has recognized the direct-liability torts of negligent hiring and retention).

Potomac filed a demurrer contending that the complaint failed to allege sufficient facts to establish vicarious liability. The trial court rejected that claim, concluding that the pleadings presented a prima facie case.

The case then proceeded to trial.

## I. Trial Evidence of H.C.

The evidence at trial proved that H.C. went to Potomac's Sentara Hospital in August 2017. She reported severe pain, which was determined to be caused in part by complications from human immunodeficiency virus (HIV). H.C. was admitted to the hospital, assigned to the cardiac telemetry unit to monitor her heart function, and given morphine for her pain.

At the time, Yeboah was a "float[ing]" registered nurse employed by the hospital, working wherever he was needed on a particular day. His possible assignments included a medical floor, a surgical floor, and the intensive care unit. He did not, however, work on the floor for "women and children." On two days during H.C.'s inpatient treatment, Yeboah was assigned to care for her in the medical-floor telemetry unit.

Because H.C. was receiving morphine, she was considered a fall risk and was not allowed to get out of bed to go to the bathroom. She testified that as a result, she was dressed only from the waist up, in a bra and shirt with "no bottoms." When H.C. needed to urinate, a nurse would hand her a bedpan and leave the room. She would use the bedpan, wipe herself, and set the bedpan on the floor. At no time did Yeboah or any other nurse help her with the intimate portions of these tasks. Further, she denied that she needed Yeboah's help to provide a urine specimen or clean up a urine spill on her bed. She also denied ever exposing her naked body to him or "com[ing] on to [him] in any way."

H.C. testified that on the second day Yeboah was assigned to care for her, on one occasion, he entered her room around 4:00 p.m. H.C. was awake and alert during that visit.

- 3 -

Yeboah took her vital signs and then gave H.C. her HIV medications, oral drugs that she took with water. He also talked to her about HIV and AIDS. Yeboah suggested that H.C. could receive support for her condition at a different medical center. He also said he knew people who were HIV positive and "it was okay for . . . [them] to have sex, use condoms[,] and . . . penetrate with the hand." After that, Yeboah administered H.C.'s morphine through her IV.

A "couple [of] minutes" after Yeboah finished administering the intravenous medication, he "walk[ed around to] the other side of [her] bed." As he did so, he put on gloves. Then Yeboah reached underneath her shirt and touched her breasts, at which point she told him to stop. He then stuck two of his fingers inside her vagina, and she again told him to stop. Next, he massaged her shoulders and back, "real hard," and she once more told him to stop. H.C. testified that Yeboah responded by "tr[ying] to play it off" and asking if she wanted him to feed her. She told him that she could feed herself and did not need his help. Yeboah removed his gloves, threw them in the trash, and left the room. As he was leaving, another nurse asked him if "everything [was] okay in there," and he responded, "[I]t's too much."

H.C. told a different hospital nurse what Yeboah had done, and the hospital reported H.C.'s complaint to the police.

The day after the incident, Detective Nathan Thomas of the Prince William County Police Department conducted an audio-recorded interview with H.C.[5] Her statements during the interview largely mirrored her trial testimony. In addition, she related that Yeboah told her "he was aroused by looking at her breasts." She added that this "shocked her." She specifically reported that Yeboah assaulted her by grabbing her breasts and penetrating her vagina with his fingers. H.C. confirmed to the detective that she was certain she did not convey to Yeboah that she had any sexual interest in him.

---

[5] H.C. testified that the recorded statement she gave to Detective Thomas was accurate.

Detective Thomas later interviewed Yeboah at the police station.[6] Yeboah at first denied the allegations and said his interactions with H.C. were limited to discussing her family, her medical conditions, and possible HIV treatments. He also told Thomas that he obtained her phone number to "put [her] in touch with some colleagues" at an "HIV center."

After Thomas suggested that "maybe" H.C. had "com[e] on to [him]," Yeboah changed his account. He said H.C. "asked him if he wanted to see anything," "grabbed his hand," and intentionally "expos[ed] her breasts and vagina" to him. Detective Thomas asked Yeboah if it was possible he touched H.C. in any of the areas she described. Yeboah said he "could have accidentally brushed her bottom" while cleaning up a spilled bedpan, but he denied groping her breasts or touching her vagina. Yeboah also stated that he rubbed lotion on her back when she complained of itching. He admitted telling H.C. that "she had a beautiful body," although he claimed he did so while trying to lift her spirits and get her to take her HIV medication. Yeboah reported "that he thought [H.C.] wanted compassion and that [was] what he was trying to give her."

Detective Thomas later spoke with Sentara Hospital's nurse manager and nurse coordinator. They told him it was "normal practice" for a nurse to put lotion on a patient only if the patient was bedridden. They also indicated that it was not "normal or acceptable practice[] to exchange phone numbers with a patient."

## II. Trial Evidence of Defendants Yeboah and Potomac

Yeboah testified and denied the inappropriate contact with H.C. He specifically denied touching her breasts, touching her vagina, penetrating it with his fingers, or sexually assaulting her in any way. Yeboah confirmed that those behaviors would have been inappropriate for him

---

[6] In the instant civil trial, Thomas testified about some of the details of that two-hour interview, and a video recording of the entire interview was played for the jury.

as a nurse, against his employer's policies, and illegal. He also specifically acknowledged that touching a female patient's breasts or vagina without either a doctor's order for medical treatment or the patient's permission "would not be empathetic." He admitted signing documentation that he had read or would read Sentara Hospital's employee handbook, which required him to act in his patients' and the employer's interests and to avoid any conflicts of interest.

Yeboah testified that during the encounter at issue, he spoke to H.C. about her HIV status and administered her morphine. He claimed he told her that while "some nurses are not comfortable taking care of HIV patients," he had "taken care of a lot of HIV patients" and was "comfortable" caring for her. He also tried to direct her to an HIV clinic for additional treatment and support.[7] Yeboah said that when H.C. complained her back itched, he put lotion on it with her permission. Yeboah denied ever needing to reach beneath H.C.'s shirt for her cardiac telemetry box. Finally, Yeboah suggested that all of his interactions with H.C. were "with [the] intent to treat and comfort" her.[8]

Leanne Carroll, a "certified registered nurse," testified for Potomac as an expert in the field of nursing. Carroll said that H.C.'s medical records did not include "an order for any sort of treatment for the breasts or vagina" that would justify Yeboah's "contact with those areas." She emphasized that if H.C.'s records had included such an order, treatment would typically be performed by a provider with specialized training, such as a labor and delivery nurse. Carroll

---

[7] Yeboah said he noticed H.C. had not taken her oral HIV medications. He suggested that he discussed her HIV status and asked about her "support system" to encourage her to take the medicine. Yeboah also presented evidence from Josie Krause, RN, that a nurse's job includes providing patient education on relevant topics, which could encompass coping with HIV and having safe sex.

[8] Yeboah admitted making inconsistent statements in his 2017 police interview and his 2019 testimony in a different case regarding whether H.C. exposed her breasts and vagina to him. He claimed that he was "confused" on both prior occasions.

noted H.C.'s allegation that Yeboah said "her breasts were beautiful and he was aroused by her vagina." She characterized those statements as "clearly sexual in nature" and "not specific to [H.C.]'s condition" or any "treatment" that a nurse would provide.

Potomac's evidence also included a portion of H.C.'s deposition testimony.[9] H.C.'s statements in that excerpt were largely consistent with her trial testimony. In addition, during the deposition, H.C. noted that Yeboah mentioned that her shirt was "see through" and her breasts and vagina were "pretty." H.C. said Yeboah told her that when he saw her and her vagina, "he got aroused." According to H.C., after Yeboah moved to the other side of the bed and touched her breasts, vagina, and back, as she told him repeatedly to stop, he "got mad," threw his gloves in the trash, and "stormed . . . out the door." H.C. denied in her excerpted deposition testimony that she asked him to put lotion on her and said he did not do so. She also denied giving him her telephone number. H.C. further said Yeboah did not engage in any nursing duties during the part of their interaction that involved the nonconsensual sexual touching. And she clarified that the discussion that Yeboah had with her about her HIV diagnosis occurred "earlier," "before he started touching [her]."

### III. Potomac's Motions to Strike and the Conclusion of the Trial

At the close of H.C.'s case-in-chief, Potomac made a motion to strike the evidence. It acknowledged the presumption of vicarious liability based on the employment relationship. Potomac argued, however, that the plaintiff defeated the presumption with her own evidence, which showed that Yeboah acted "significantly outside of what [he was] supposed to be doing" and had "a bad motive." The trial court denied Potomac's motion to strike. It ruled that H.C.'s

---

[9] The jury was instructed that to the extent H.C.'s deposition and trial testimony were inconsistent, it could "consider[] . . . what [she] previously said []as true." *See* Rule 4:7(a)(3) (providing that under certain circumstances, a "deposition of a party . . . may be used by an adverse party for any purpose").

evidence, which it was required to accept as true, established that Yeboah engaged in an "ill[-]conceived attempt to comfort" H.C. and "reassure her that despite her HIV status, . . . she[ was] still . . . desirable."

At the close of all the evidence, Potomac renewed its motion to strike on the scope-of-employment question. It asserted that the only evidence of Yeboah's state of mind was "his own words" that touching a patient in the fashion alleged was against policy, against the law, and not empathetic. Potomac reasoned that if the jury determined Yeboah touched H.C. in the way she said he did, it could not also find he was acting with the intent to comfort her in compliance with the employer's mission.[10]

H.C. responded that the jury could choose to believe only part of Yeboah's testimony. She suggested it could credit her testimony that the unlawful touching occurred and "pair that with Mr. Yeboah's characterization of his mindset" that he was "acting [to] comfort[] and reassur[e]" her. H.C. argued the jury could decide that a "very, very small sliver of [Yeboah's] conduct was for the benefit of [Potomac]," meaning that the acts were in the scope of employment, even though "the overwhelming majority" was for his "own personal motive."

Taking into account the full record and the arguments of the parties, the trial court granted Potomac's motion to strike. The court acknowledged Yeboah's testimony that he was trying to comfort H.C., but it noted an absence of "any sliver of evidence" that would connect Yeboah's duties or "acts of claimed compassion to the sexual assault" itself. The court reasoned that the assault "st[ood] alone." It further held that the sexual assault was "a marked deviation from [Potomac]'s business" and that Yeboah's motive "must have been his own" rather than his employer's. As a result, the court concluded no evidence showed that Yeboah's sexual assault

_____

[10] Potomac contended Yeboah "had a nefarious motive to" commit a battery or "he interpreted [H.C.'s] actions as inviting . . . sexual contact," either of which would have been a personal motive.

- 8 -

occurred in the scope of employment. After granting the motion to strike, the court dismissed Potomac from the case.

The jury later returned a verdict in H.C.'s favor, awarding her $500,000 in damages against Yeboah.

ANALYSIS

H.C. contends the trial court erred by granting Potomac's motion to strike at the close of all the evidence. First, she challenges the way the court applied the burden of proof. Second, she argues it erred by holding the evidence proved, as a matter of law, that Yeboah was not acting in the scope of his employment when he sexually battered her.

A circuit court ruling on a motion to strike must "presum[e] that the jury will believe all the evidence favorable to the plaintiff, as well as all reasonable inferences that a jury might draw" in the plaintiff's favor from the evidence. *Dill v. Kroger Ltd. P'ship I*, 300 Va. 99, 109 (2021). When applying these principles, the court "may also consider the evidence presented during the defendant's case." *Austin v. Shoney's, Inc.*, 254 Va. 134, 138 (1997). The court may not, however, "judge the weight or credibility of evidence, because to do so 'would invade the province of the jury.'" *Dill*, 300 Va. at 109 (quoting *Tahboub v. Thiagarajah*, 298 Va. 366, 371 (2020)). If the evidence, viewed under the proper standard, "is insufficient as a matter of law to support the plaintiff's claim, . . . [the] issue should not be submitted to the factfinder." *Graydon Manor, LLC v. Bd. of Supervisors.*, 79 Va. App. 156, 166 (2023). But "if the evidence leaves the question [of liability] in doubt[,] it becomes an issue to be determined by the jury." *Plummer v. Ctr. Psychiatrists*, 252 Va. 233, 235 (1996) (quoting *Kensington Assocs. v. West*, 234 Va. 430, 433 (1987)); *see Bentley v. Felts*, 248 Va. 117, 119-20 (1994) (holding that if "reasonable minds could differ" about the appropriate resolution, the court should "den[y] the motion to strike").

This "same standard is applicable to [the appellate court's] review of the decision of the trial court granting the motion to strike." *Baysden v. Roche*, 264 Va. 23, 26 (2002).[11]

The Court is further guided in its review by the well-established principle from *Massie v. Firmstone*, 134 Va. 450 (1922), that a plaintiff "can rise no higher than the 'facts within [her] own knowledge and . . . to which [she] has testified.'" *Smith v. Commonwealth*, 72 Va. App. 523, 543 n.7 (2020) (alterations in original) (quoting *Travis v. Bulifant*, 226 Va. 1, 4-5 (1983) (quoting *Massie*, 134 Va. at 462)); *accord Williams v. Commonwealth*, 234 Va. 168, 176 (1987). This principle also applies to "the necessary inferences" from a plaintiff's testimony. *Ford Motor Co. v. Bartholomew*, 224 Va. 421, 431 (1982) (quoting *Baines v. Parker*, 217 Va. 100, 104 (1976)). *But see id.* (noting that a plaintiff is not bound by her statements *of opinion*). As to facts introduced only by other witnesses, however, the plaintiff "has the right to ask the . . . jury to accept as true the[ir] statements most favorable to [her]." *See Baines*, 217 Va. at 104. In short, the standard for reviewing the evidence on a motion to strike in the light most favorable to the plaintiff must be tempered by the *Massie* principle limiting the plaintiff by her factual testimony.

Reviewing the trial court's ruling on the motion to strike here also requires a careful examination of the principles of respondeat superior liability under Virginia law. Respondeat

---

[11] On appeal, H.C. mentions various categories of evidence that were affirmatively excluded at trial—other incidents of "sexual assault [and] harassment" by Yeboah; his criminal conviction and incarceration; and the revocation of his nursing license. None of this evidence is before this Court. H.C. also refers repeatedly to "annual well-woman exam[s]" and the types of touching she alleges they include. The *record*, however, does not address such examinations. It is axiomatic that in ruling on a motion to strike, the circuit court—and correspondingly, the appellate court reviewing such a ruling—may consider only the evidence that was actually presented to the jury. *See generally Taylor v. Commonwealth*, 78 Va. App. 147, 156 (2023) (noting that a party cannot rely on judicial notice of a fact on appeal unless the trial court clearly stated that it took judicial notice); *Thomas v. Commonwealth*, 48 Va. App. 605, 609-10 (2006) (explaining that facts judicially noticed by a court are not imputed to the jury, which must be specifically instructed regarding any such facts). Consequently, we do not consider any of these things in reviewing the trial court's ruling granting Potomac's motion to strike the evidence.

superior liability means employer "liability for the tort of another person." *Parker v. Carilion Clinic*, 296 Va. 319, 332 n.3 (2018) (quoting 2 Dan B. Dobbs et al., *The Law of Torts* § 425, at 779 (2d ed. 2011)). "By definition, [it] is wholly vicarious in nature . . . ." *Id.* This form of liability applies to intentional tort cases as well as to those involving mere negligence. *Id.* Even so, an employer "is not liable for *every* wrong [that an employee] may commit during the continuance of an employment." *Id.* at 335 (emphasis added) (quoting *E.H. Abernathy v. Romaczyk*, 202 Va. 328, 332 (1960)). "Instead," in general terms, "'an employer is liable for the tortious acts of his employee if the employee was performing his employer's business and acting within the scope of his employment.'" *Id.* (quoting *Kensington Assocs.*, 234 Va. at 432).

With these general principles in mind, we turn to H.C.'s specific claims about the trial court's application of the burden of proof and its ruling on Potomac's motion to strike in light of the record before us.

## I. Burden-Shifting Framework

H.C. first argues that the trial court erred as a matter of law "by ignoring the burden-shifting framework" applicable in respondeat superior cases. Potomac responds that H.C. failed to preserve this objection for appeal and also contests her challenge on the merits.

Under settled precedent, "a rebuttable presumption that an employee was acting within the scope of his employment arises when the plaintiff alleges an employment relationship." *A.H. v. Church of God in Christ, Inc.*, 297 Va. 604, 633 (2019). This presumption "shifts the burden of *production* to the employer to present facts sufficient to permit the factfinder to conclude that the employee was not acting within the scope of his employment at the time of [the] tortious conduct." *Id.* (emphasis added) (quoting *Parker*, 296 Va. at 333 n.6). The presumption applies in all phases of the litigation, "begin[ning] with the complaint." *Id.* at 634 (alteration in original) (quoting *Parker*, 296 Va. at 334). Consequently, application of the presumption often allows

plaintiffs to survive challenges to the prima facie legal sufficiency of their pleadings lodged before the parties present evidence. *See Parker*, 296 Va. at 341-42 (recognizing that a plaintiff is theoretically capable of "plead[ing] herself out of court by affirmatively alleging facts that rebut the presumption . . . [,] no differently than a litigant at trial can rely on an evidentiary presumption and yet assert facts that undermine it," but that, in practice, "defeat[ing] the presumption" usually requires the resolution of "factual contests" that cannot be addressed before trial); *accord Our Lady of Peace, Inc. v. Morgan*, 297 Va. 832, 850 (2019); *A.H.*, 297 Va. at 614-16, 634 & n.19; *Plummer*, 252 Va. at 237. At the same time, despite this rebuttable presumption or inference, "[t]he burden of *persuasion* stays with the plaintiff." *Parker*, 296 Va. at 633 n.6 (emphasis added). As a result, *at trial*, "[t]he scope-of-employment 'presumption disappears in the face of positive facts to the contrary.'" *Our Lady of Peace*, 297 Va. at 848 (quoting *Parker*, 296 Va. at 342).

We assume without deciding that H.C. preserved her claim about the shifting of the burden of production below because the record shows that the trial court did not misapply the burden. *See generally McGinnis v. Commonwealth*, 296 Va. 489, 501 (2018) ("'assum[ing] without deciding' that [an] issue c[ould] be reviewed" on the merits to "resolve the appeal on the best and narrowest ground[]"). H.C. suggests that the evidence left in doubt whether Yeboah was acting within the scope of his employment when he sexually battered her and, as a result, the case should have gone to the jury. The court, however, held that "no evidence" showed the sexual battery was "performed as part of [Potomac]'s business." This holding does not reflect that the trial court misunderstood the shifting burden of production. Instead, it supports the conclusion that the trial court ruled as a matter of law that H.C. did not meet her burden of producing evidence at trial. The record, viewed under the proper standard, and as developed below, supports the trial court's ruling that the evidence was insufficient as a matter of law for

- 12 -

the jury to conclude that Potomac was liable for Yeboah's intentional tort under respondeat superior principles.[12]  *Cf. Parker*, 296 Va. at 330 & n.2 (recognizing in reviewing the grant of a demurrer that the appellate court must accept all factual allegations and inferences as true, limited to those that are not inherently impossible or contradicted, those that are reasonable, and those that are truly factual, not legal).

Consequently, we proceed to examine the sufficiency issue in greater detail.

## II.  Ruling on the Motion to Strike

As her second challenge, H.C. contends the trial court erred by holding that no evidence established Yeboah was acting within the scope of his employment when he sexually battered her.

Determining whether the trial court erred by granting the motion to strike requires an examination of the nature of Yeboah's actions to determine whether he was "performing his employer's business *and* acting within the scope of his employment."  *See Kensington Assocs.*, 234 Va. at 432 (emphasis added), *quoted in Parker*, 296 Va. at 335.  The Supreme Court of Virginia has recognized more than once that these principles are "conceptually 'vexatious'" and difficult to apply.  *Parker*, 296 Va. at 335 (quoting *Gina Chin & Assocs. v. First Union Bank*, 260 Va. 533, 541 (2000)).  They come into play to hold an employer liable "only when the relation of [employer] and [employee] is shown to exist between the wrongdoer and the

---

[12] H.C. implies that because the trial court denied the first motion to strike, it must have concluded that she presented adequate evidence in her case-in-chief to cause the burden to shift. She then asserts that the court erred because it stated in ruling on the renewed motion to strike that neither her own testimony nor any of the rest of her evidence connected Yeboah's intentional tort to his employment.  To the extent she suggests the trial court was not entitled to change its ruling, that suggestion is incorrect.  Even if the rulings were inconsistent, the trial court retained the authority, under Rule 1:1(a), to change its ruling until twenty-one days after entry of a final order.  *See Qiu v. Huang*, 77 Va. App. 304, 323 n.10 (2023) (rejecting a claim that a court erred by overruling an "original demurrer" to a fraud count and later sustaining a renewed demurrer to that count).  Consequently, any inconsistency between the rulings does not support a claim of error.  *See McGinnis*, 296 Va. at 501.

[employer] *at the time and in respect to the very transaction out of which the injury arose*." *Id.* at 336 (quoting *Manuel v. Cassada*, 190 Va. 906, 913 (1950)). "[T]his job-related-service principle" does not absolutely limit liability "'to those acts of the [employee that] promote the object of the employment.'" *Id.* (quoting *Manuel*, 190 Va. at 913 (emphasis omitted)). But liability cannot be imposed "if the tortious act did not arise out of the 'very transaction,' or service or task, that the employee was being paid to perform." *Id.* at 336-37 (quoting *Manuel*, 190 Va. at 193). And the Supreme Court has emphasized this lack of liability even though "the employee was using the [employer]'s property and the injury would not have been caused without the facilities afforded the employee by reason of his relation to his employer." *Id.* at 337 (quoting *Bryant v. Bare*, 192 Va. 238, 244 (1951)).

The Supreme Court has provided guidance regarding this concept. It recognizes that fraud—if committed in the very service for which one is employed, such as while negotiating a contract or accepting a check for deposit—falls squarely within the doctrine of respondeat superior. *Id.* at 337-38. This is so because "the tortious act or transaction occurred *while* the employee was . . . performing a *specific job-related* service for the employer, and, but for the employee's wrongdoing [by fraud], the service would otherwise have been within the authorized scope of his employment." *Id.* at 338. The Court contrasted the job duties of a bank teller who knowingly deposited a forged check with those of a janitor at the bank. *Id.* at 337-38. Although the bank teller committed the act as part of a "normal function" of her job, thereby resulting in vicarious liability, "[t]he bank would *not* have been vicariously liable if [the] janitor . . . stepped aside from [his] 'normal function' [as] a janitor . . . to deposit a customer's forged check." *Id.* (emphasis added and omitted) (quoting *Gina Chin*, 260 Va. at 545); *see also id.* at 336-37, 341 n.11 (noting that the analysis is both "employee-specific" and task-specific). In other words, it is not enough to show merely that "the employee was 'on the clock,' using the employer's

- 14 -

property, or on the employer's premises at the time of the alleged tortious acts." *Id.* at 339; *see Cary v. Hotel Rueger, Inc.*, 195 Va. 980, 986-87 (1954) (upholding a ruling granting a motion to strike on behalf of a hotel after its employee, a bellboy, shot the victim in the hotel's elevator because the shooting resulted from a personal dispute unrelated to the bellboy's operation of the elevator or any of the employee's duties), *cited with approval in Com. Bus. Sys.*, 249 Va. at 45-46, *and Parker*, 296 Va. at 339 n.10.

Additionally, "[t]he employee's motive in committing the tortious act plays a role in the job-related service doctrine." *Parker*, 296 Va. at 340. "[I]n many cases, perhaps most, an employee's intentional torts are purely personal acts and thus not within the scope of employment." *Id.* at 338 (quoting 2 Dobbs, *supra*, § 429, at 796). A "tortious act 'is withi[n] the scope of employment . . . only if . . . it is actuated, *at least in part*, by a purpose to serve the [employer].'" *Id.* at 340 (first and third alterations in original) (quoting *Restatement (Second) of Agency* § 228(1)(c) (Am. Law Inst. 1958) (emphasis added)). Stated more simply, "improper motive" is "a factor to be considered." *Id.* at 341 (quoting *Gina Chin*, 260 Va. at 543). If "the deviation from the employer's business is slight on the one hand, or marked and unusual on the other," the trial court may resolve the issue as a matter of law. *See id.* (quoting *Gina Chin*, 260 Va. at 544). If, by contrast, the deviation "falls . . . between those two extremes, the question is for the jury." *Id.* (quoting *Gina Chin*, 260 Va. at 544).

The Supreme Court has recognized that "acts [of sexual touching] could occur 'while the employee was in fact performing a specific job-related service for the employer' and while [the employee was] actively engaged in a job-related service.'" *Our Lady of Peace*, 297 Va. at 849 (second alteration in original) (quoting *Parker*, 296 Va. at 338-39 (emphasis omitted)). If the employee's "acts of molestation occurred *simultaneously* with his performance of . . . job-related services" such as while "undressing" or "bathing" a resident of a nursing home, "a reasonable

jury could infer that [the employee charged with personal hygiene care] acted from a *mixed* motive and not '*wholly* from some external, independent, and personal motive.'" *Id.* (first and second emphasis added) (quoting *Parker*, 296 Va. at 340).

Here, by contrast, the evidence, viewed under the proper standard for a motion to strike, was that the acts of sexual molestation did not coincide with Yeboah's performance of any job-related services and resulted instead from a wholly personal motive.

H.C. testified that on the particular visit to her hospital room at issue, Yeboah performed several nursing duties, including taking her vital signs and administering oral medication. While performing those duties, he talked to her about her HIV status, her medications, and her options for treatment of her HIV. According to both H.C. and Yeboah, his duties did not involve helping her on or off the bed pan or tending directly to any matters of personal hygiene. She was classified as a "self-care" patient and was able to do those things on her own. Yeboah also did not change her bedding. H.C. was in the telemetry unit, meaning she had electrodes attached to her chest that were connected to a box located beneath her clothing that transmitted data about her heart function. Neither she nor Yeboah, however, claimed that he was engaged in any job-related duties involving the telemetry box when the sexual assault took place or even during that particular visit to her hospital room.

According to H.C., Yeboah's acts of sexual battery—massaging her breasts and penetrating her vagina with his fingers—took place *after* he completed his nursing duties. The evidence further established that the acts followed Yeboah's earlier statements that "she had a beautiful body" and "he was aroused by looking at her breasts" and "her vagina." The sexual assault occurred at the end of a particular visit to H.C.'s room. A "couple [of] minutes" after his final duty of administering morphine through her IV, he put on rubber gloves, walked to the other side of her bed, and committed the nonconsensual sexual touching. First, he placed one

- 16 -

hand underneath her shirt and massaged her breasts. When H.C. told Yeboah to stop, he reached beneath her bedcovers and inserted his gloved fingers into her vagina. When she again told him to stop, he moved to massaging her shoulders and back "real hard." She then told him to stop for a third time. After H.C. declined Yeboah's gratuitous offer to feed her, made on the heels of the attack, he appeared "mad." He threw his gloves in the trash and "stormed . . . out the door" in a way that caused a nurse in the hallway to ask him if "everything [was] okay in there."

Finally, at some point, Yeboah obtained H.C.'s telephone number, contrary to "acceptable" hospital practice. This evidence further indicated that Yeboah was on his own mission rather than that of his employer.

Based on this record, the trial court did not err by resolving the vicarious liability issue here as a matter of law because no evidence established that Yeboah's acts as related by H.C. were in any way actuated by a purpose to serve his employer. Yeboah's deviation from his employer's mission was "marked and unusual" and therefore did not present a question for the jury. *See Parker*, 296 Va. at 341 (quoting *Gina Chin*, 260 Va. at 544).

H.C. characterizes the facts as leaving open the possibility that Yeboah was engaged in a nursing duty that involved helping her on or off the bedpan, cleaning up a urine spill, or something similar. This characterization, however, overlooks the *Massie* principle that H.C. can rise no higher than her own testimony about what took place and when. H.C.'s testimony indicates that Yeboah performed no nursing duties at all during the encounter that involved even being in proximity to her breasts or her vagina. Further, Yeboah confirmed that none of his job duties required him to touch her breasts or touch or penetrate her vagina. He stated that if he had needed to examine H.C.'s telemetry box, he would have asked her to hand it to him rather than reaching under her shirt to retrieve it. He also indicated that if he had needed to check or reattach any of the electrodes on her chest, he would have notified her first and given her the

- 17 -

right to refuse. And neither H.C. nor Yeboah testified that he did any of these things during the incident that H.C. reported. Finally, he confirmed that touching a female patient's breasts or vagina without a doctor's order or the patient's permission would be contrary to his duty to show empathy to his patients, against Potomac's policies, and illegal. Consequently, the evidence failed to prove a prima facie case of sexual battery committed while Yeboah was performing his employer's business and acting within the scope of his employment.

The two cases on which H.C. relies most directly in support of her argument, *Our Lady of Peace, Inc. v. Morgan*, 297 Va. 832 (2019), and *Plummer v. Center Psychiatrists*, 252 Va. 233 (1996), do not support a different result. In both of those cases, the issue was whether the plaintiff adequately made out a prima facie case at the pleading stage based on the allegations in the complaint. *Our Lady of Peace*, 297 Va. at 838-42, 850; *Plummer*, 252 Va. at 234, 237. And in both cases, the Supreme Court held only that the circuit court should have permitted the parties to present evidence on the vicarious liability issue at a trial. *See Our Lady of Peace*, 297 Va. at 850; *Plummer*, 252 Va. at 237; *see also Parker*, 296 Va. at 341-42 (recognizing that "defeat[ing] the presumption" of vicarious liability usually requires the resolution of "factual contests" that cannot be addressed before trial).

Here, by contrast, the trial court in fact had the benefit of the complete record of the six-day trial, developed well beyond the pleadings, putting it in a position to evaluate, as a matter of law, precisely the same evidence the jury would consider in its role as factfinder. Although the court was not permitted to make factual findings, it was entitled to examine H.C.'s version of the facts and the undisputed evidence and, given the lack of any dispositive legal issues based on those facts, to rule as a matter of law. *See E.H. Abernathy*, 202 Va. at 330, 334 (reversing a refusal to set aside a verdict against an employer because, although a traffic accident occurred in the scope of employment, the fight that caused the injuries sued for, started by an employee who

- 18 -

arrived afterward, did not); *Doe ex rel. Doe v. Baker*, 299 Va. 628, 641, 649 (2021) (distinguishing *E.H. Abernathy* in a vicarious liability case "dismissed on a demurrer" because that case "went to trial" and the standard under which the appellate court was required to view the evidence in the two cases therefore differed significantly).

H.C. further suggests that the court should have permitted the jury to decide whether Potomac was vicariously liable for Yeboah's sexual battery against her because part of his motive, however small, could have included a misguided attempt to empathize with her on Potomac's behalf. No evidence, however, either direct or circumstantial, supports a finding that Yeboah performed the specific acts at issue with the intent, although mistakenly or ill-advisedly, to further the employer's interests. The record contains no direct evidence at all of Yeboah's intent at the time of the sexual battery because he testified he did not touch H.C.'s breasts or penetrate her vagina with his hand.[13] As a result, and as the trial court concluded, any intent about which he did testify was not affirmatively connected to that behavior. Additionally, he specifically disclaimed that touching a patient sexually could be an empathetic act in furtherance of the employer's interests. As a result, the evidence supported only a finding that, if he committed the acts as H.C. contended, he did so in his own self-interest. Further supporting this as the only view of the record is the circumstantial evidence of Yeboah's personal intent. That intent was demonstrated by H.C.'s testimony that he appeared "mad" when she rebuffed his advances. Supporting this inference was the fact that another nurse asked him when he left the room if "everything [was] okay in there" and he replied, "[I]t's too much." *See generally McNeill v. Spindler*, 191 Va. 685, 695-96 (1950) (holding a deliveryman acted outside the scope

---

[13] H.C., of course, could not testify directly about Yeboah's intent. *See generally Williams v. Commonwealth*, 278 Va. 190, 194 (2009) ("Absent a direct admission by [a party], [his] intent . . . must necessarily be proved by circumstantial evidence.").

of his employment by using his employer's truck for a personal matter after performing a specific work-related errand), *cited with approval in Kensington Assocs.*, 234 Va. at 434.

The evidence therefore supports the trial court's ruling granting Potomac's motion to strike and dismissing it from the case.

CONCLUSION

For these reasons, we hold the record does not establish that the trial court misapplied the burden-shifting framework applicable in vicarious liability cases. We further hold the evidence supports the trial court's ruling, as a matter of law, that Potomac was not vicariously liable for Yeboah's sexual battery. As a result, the trial court's judgment is affirmed.

*Affirmed.*